# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| RON MORRIS, | ) |
| Plaintiff, | ) Case No.: 15 CV 2923 |
| v. | ) |
| BNSF RAILWAY COMPANY | ) Honorable Matthew F. Kennelly |
| Defendants. | ) |

## DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW

Defendant BNSF Railway Company ("BNSF"), by its attorneys, LaPointe Law, P.C., hereby moves, pursuant to Federal Rule of Civil Procedure 50(a) for judgment as a matter of law. In support of this motion, Defendant states as follows:

## RULE 50 LEGAL STANDARD

Pursuant to Fed. R. Civ. P. 50(a), a trial judge "must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Put simply, a judgment as a matter of law "allows the court to take away from the jury's consideration cases or issues when the facts are sufficiently clear that the law requires a particular result." *Weisgram v. Marley Co.*, 528 U.S. 440, 448 (2000). When a party "has been fully heard on an issue and there is no legally sufficient basis for a reasonable jury to find for the party on that issue," judgment as a matter of law is proper. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 149 (2000).

"The standard governing a Rule 50 motion mirrors that employed in evaluating a summary judgment motion." *Appelbaum v. Milwaukee Metropolitan Sewerage District,* 340 F.3d 573, 578 (7th Cir. 2003). In weighing a motion under Rule 50(a), a court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility

determinations or weigh the evidence." *Waite v. Bd. of Trs.*, 408 F.3d 339, 343 (7th Cir. 2005). Ultimately, "[t]he judge's inquiry . . . unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## STANDARD FOR RACE DISCRIMINATION

Plaintiff has brought race discrimination claims, alleging that BNSF wrongfully discharged him in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. In order to succeed on his race discrimination claim at trial, Plaintiff had to prove, by a preponderance of the evidence, that BNSF would not have been terminated if he was not African-American, and everything else remained the same. *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 763-64 (7th Cir. 2016). Specifically, Plaintiff needed evidence that establishes: (1) he is a member of a protected class; (2) he was meeting BNSF's legitimate expectations; (3) he suffered an adverse employment action; and (4) at least one similarly situated employee not in his protected class was treated more favorably. *Watkins v. Riverside Med. Ctr.*, 2019 WL 643426, at *2 (7th Cir. Feb. 15, 2019), *citing David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 225 (7th Cir. 2017).

Seventh Circuit precedent firmly establishes that for an individual to be similarly-situated to the plaintiff, the Plaintiff must show that the person and Plaintiff both (1) were subject to the same standards and rules, (2) had the same role, (3) engaged in similar conduct without differentiating or mitigating circumstances that would distinguish their conduct or Defendant's treatment of the conduct, and (4) the same decision-maker made the disciplinary decisions affecting the other employee and Plaintiff. *Johnson v. Advocate Health and Hospitals Corp.*, 892 F.3d 887, 895 (7th Cir. 2018); *Skiba v. Ill. Central R.R. Co.,* 894 F.3d 708, 723 (7th Cir. 2018); *Coleman v. Donahoe*, 667 F.3d 835, 846-53 (7th Cir. 2012); *Ellis v. United Parcel Srvc.*,

523 F.3d 823, 825-26 (7th Cir. 2008); *Humphries v. CBOCS West Inc.*, 474 F.3d 387, 404-05 (7th Cir. 2007); *Little v. Ill. Dep't of Revenue*, 369 F.3d 1007, 1012 (7th Cir. 2004); *Rogers v. City of Chicago*, 320 F.3d 748, 754 (7th Cir. 2003); *Moore v. Transport Holding*, LLC, 2017 WL 3531566, at 3-4 (N.D. Ill. August 17, 2017). "[I]n a case involving disparate discipline," while "a precise equivalent" is not required, "the conduct of the comparators must be of 'comparable seriousness.'" *Id.* at 7, *citing Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012), *quoting McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 283 n. 11 (1976).

## ARGUMENT

**1. Plaintiff has not identified a similarly situated employee who in not African American, who BNSF treated more favorably.**

Plaintiff admits he engaged in conduct that legitimately resulted in Stand Alone dismissal under BNSF's progressive discipline policy. Specifically, he admitted to:

- Form A speeding violation (10 MPH over limit) – FRA de-certifiable
- Mored siding – (12 MPH over limit) – FRA de-certifiable
- Pursuant to PEPA:
    - Form A speeding violation was a "Serious violation"
    - Mored siding speeding violation was a "Serious violation"
    - These two FRA de-certifiable speeding violations considered "Multiple Serious violations committed in the same tour of duty."
    - This was a stand-alone dismissible violation
- As the Conductor, he was in charge of the train
- As the Conductor, he had the duty to warn Engineer Jones about flags/signals
- He did not report the Form A speeding violation
- He did not report the Mored siding speeding violation

He argues, however, that Caucasian employees engage in similar or worse conduct, yet were not terminated. This theory fails for two reasons. First, at the close of his case and following more than two days of testimony, Plaintiff has not shown that any employee (other than Mr. Jones) engaged in similar conduct without differentiating or mitigating circumstances that would distinguish their conduct or BNSF's treatment of the conduct. Second, he has also

failed to present any evidence indicating the same decision-makers involved in his dismissal also reviewed and approved the discipline – or lack thereof – of the purported comparators.

A. <u>No employee engaged in comparable conduct</u>.

BNSF terminated Plaintiff because he committed the Stand Alone Dismissible Violation of "multiple Serious violations during the same tour of duty." This dismissal was in accordance with BNSF's progressive-discipline policy, the "Policy for Employee Performance Accountability" ("PEPA").

With regard to Morris and his dismissal, the jury learned the full picture, through a record well developed on this issue. Yet, in reviewing only the 24 comparators' Employee Transcripts, Alternative Handling records and Investigation Waivers, as well as Mr. Hendrickson's limited testimony on this issue, the jury learned only a snap-shot of their conduct. The problem for Plaintiff is that this evidence is wholly insufficient to establish conduct comparable to Plaintiff. The records don't shed much light at all on what each employee did and, none of the records establish any employee engaged in the conduct that resulted in Plaintiff's dismissal. I.e., there is no evidence any other employee (with the exception of Mr. Jones) engaged in the conduct BNSF classifies as "a Serious rule violation," both events of which were decertifiable, not once, but twice, in a single tour of duty, while operating a Key train and without reporting the Serious rule violations, in further violation of BNSF rules.

As for witness testimony, <u>no</u> witness competently testified as to what each of the 24 employees did and the discipline BNSF assessed. Former Superintendent of Operations Scott Hendrickson was asked to review all the documents related to these 24 people. Hendrickson supervised 675 people at any given time during the three and one-half years he served as Superintendent of Operations of BNSF's Chicago Division. Most of the time he was not at the Aurora Terminal. Not only is there no evidence in the record to indicate that Hendrickson ever

knew about, much less was involved, in any decision with regard to the many decisions related to these 24 people – many of which *occurred nine years ago* – there is no evidence that he even recalled any of these employees. He was not even asked this question for the vast majority of these people. Importantly, after reviewing all the comparator documents, Mr. Hendrickson concluded his testimony as follows:

> Q. From the documents you went through on all these employees, can you tell definitively whether they engaged in dismissible standalone events?
>
> A. No, I could not tell you that based on this information.
>
> Q. And did any of those individuals have two Serious rule violations on the same tour of duty?
>
> A. Not that I can tell based on the information that was provided.
>
> . . .
>
> Q. All the different individuals that we went through, the 24 or whatever individuals that counsel went through, do you know or could you tell whether any of these individuals had a violation on a Key Train, a hazardous materials train?
>
> A. No, sir, I could not.

Plaintiff Trial Deposition of Hendrickson, 252:17-253:3, 254:3-9.

If Mr. Hendrickson, with his 24 years of BNSF experience, could not determine whether any of these 24 individuals engaged in comparable conduct based on these cryptic descriptions, how can the jury be able to reasonably make all these 24 comparisons? In short, there was _no_ witness at trial who provided _any_ details for the jury to properly compare the alleged comparators to Plaintiff.

    B. <u>There is no evidence establishing the same decision makers were involved</u>.

BNSF showed that 5 individuals played some role, ranging from simple review, to recommendation, to final decision, with regard to BNSF's ultimate decision to terminate Plaintiff. There were:

> Hearing Officer Brett Russell: recommended Level S and probation
> Superintendent of Operations Scott Hendrickson: reviewed Russell's recommendation & forwarded to PEPA Team
> PEPA Team/Labor Relations Andrea Smith: recommended dismissal
> General Manager of Division Jason Jenkins: agreed with recommendation to dismiss
> Regional VP of Operations Rob Reilly: made final decision to dismiss

Plaintiff presented no evidence as to who was involved in making any of the alternative handling and waiver decisions related to the 24 purported comparators – much less that the same decision makers were involved.

**2. No other evidence of race discrimination.**

Plaintiff presented no other evidence that indicated BNSF subjected him to race discrimination. BNSF, on the other hand, showed that (1) Caucasian Trainmaster Brett Russell, who knew Plaintiff's race, recommended BNSF not dismiss Plaintiff, but instead issue him a Level S with a 30-day record suspension and a probationary period; (2) Superintendent of Operations Scott Hendrickson did not know his race and, in fact, made no recommendation with regard to his discipline; (3) Andrea Smith, Labor Relations, was the first BNSF manager to recommend BNSF terminate Plaintiff – and there is no evidence she knew his race; (4) neither is there evidence Jason Jenkins and Rob Reilly, who made the final discipline decisions, were aware of his race. Further, with regard to the purported comparators, Scott Hendrickson testified over and over that he did not know the employees' race. And, Caucasian employee Tom Lynch, was terminated twice – while Hendrickson was the Superintendent of Operations – and was denied Alternative Handling after engaging in conduct that implicated BNSFs Critical Work Practices, as was Plaintiff.

### 3. Morris' Alternative Handling and Waiver Arguments are Precluded by the Railway Labor Act.

The crux of Plaintiff's case is that BNSF applied the portions of the governing collective bargaining agreement that address discipline in a disparate manner to other, Caucasian, members of his union. Specifically, he claims (1) BNSF afforded other conductors, as well as engineers Alternative Handling, as permitted under the Safety Summit Agreement (J. Ex. 26) between his union and BNSF, and allowed others to exercise their right, under the Memorandum of Agreement between BNSF and United Transportation Union (J. Ex. 27), to waive their right to investigation, appeal and arbitration, in exchange for accepting fault and the resultant discipline ("Waiver.") Those less severe levels of discipline are established through BNSF's Collective Bargaining Agreement with Morris' union. And it is well-established that claims brought under state or federal law that, in reality, assert rights vested in a collective bargaining agreement are precluded by the Railway Labor Act. *Tice v. American Airlines, Inc*., 288 F.3d 313, 316-17 (7th Cir. 2002). Put another way, if the "heart of the dispute" is "a disagreement over the interpretation" of the CBA, the dispute must be resolved through arbitral boards established under the RLA. *Brown v. Illinois Central R.R. Co.,* 254 F.3d 654, 664 (7th Cir.2001); *Tice,* 288 F.3d at 313.

Deciding whether Morris was entitled to alternative handling, at all, necessarily requires an interpretation of the CBA, which sets forth the eligibility guidelines for alternative handling. *See Brisbois v. Soo Line Railroad Company,* 124 F.Supp. 3d 891 (D. Minn. 2015). In *Brisbois,* the employee argued he was denied reimbursements and promotions in retaliation for having engaged in protected activity. *Id.* at 897. Because the reimbursements and promotions at issue arose solely from the CBA, the court held that it would be "impossible … to adjudicate [the employee's] claims without interpreting provisions of the CBA." *Id.*

The evidence and testimony produced by Morris at trial centers around the premise that Morris *should* have received alterative handling or *should* have been permitted to waive his right to an investigation, as opposed to face dismissal, as a result of his multiple serious violations during the same tour of duty. Such a result would require that the jury interpret the Safety Summit Agreement and the Memorandum of Agreement between BNSF and United Transportation Union and determine whether, pursuant to the terms of those collective bargaining agreements, Plaintiff was entitled to alternative handling or waiver.

4. **Plaintiff Has Failed to Exhaust Administrative Remedies.**

In his EEOC charge, Plaintiff alleged only "I was disciplined, whereas similarly situated, non-Black employees were not disciplined. Subsequently, I was discharged, whereas similarly situated, non-Black employees were not discharged." In his trial however, Plaintiff did not argue that BNSF should have assessed lesser discipline under its progressive discipline policy ("PEPA"). Rather, he alleged solely that the adverse employment action he suffered was being denied alternative handling or not being permitted to waive his right to an investigation.

Further, any claim that BNSF should have provided him alternative handling is time-barred. BNSF responded to Plaintiff's union representative's request for alternative handling – denying the request – by way of a letter, dated April 10, 2013. Plaintiff did not file his EEOC charge until February 13, 2014. His 300-day deadline to assert any claim regarding BSNF's denial of alternative handling was February 4, 2014, nine days before he filed his charge.

5. **Plaintiff Has Failed to Present Evidence Sufficient to Support a Claim for Punitive Damages.**

If the Court determines Plaintiff's case should be decided by the jury, the Court should prohibit any award of punitive damages because Plaintiff produced no evidence whatsoever indicating BNSF acted maliciously or with reckless indifference. In order to support a claim for

punitive damages, Plaintiff must present evidence that demonstrates that BNSF discriminated against him with malice or reckless indifference to the law. 42 U.S.C. § 1981a(b)(1); *See Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1025 (7th Cir. 2016). In order to establish that an employer acted with "malice" or "reckless indifference," Plaintiff must show that BNSF acted "in the face of a perceived risk that its actions [violated] federal law." *Kolstad v. Am. Dental Assoc.,* 527 U.S. 526, 536 (1999). "[A] positive element of conscious wrongdoing is always required." *May v. Chrysler Grp., LLC*, 716 F.3d 963, 974 (7th Cir. 2013), *quoting Kolstad*, 525 U.S. at 538. Instead, BNSF showed it has a comprehensive equal employment opportunity policy, as well as a Code of Conduct, that prohibits discrimination, harassment and retaliation based on race, as well as all other protected categories. BNSF requires that every manager undergo training on its policies every year and that exempt employees undergo training every other year. BNSF policies direct employees to report complaints and concerns to their supervisor, human resources or, anonymously, through its 24-hour hot-line. The EEO Policy, as well as the Code of Conduct, are available to all employees through BNSF's intra-net.

## **CONCLUSION**

The Plaintiff has been fully heard on his claims. After the completion of more than two days of testimony to the jury, Plaintiff has not established a legally sufficient basis for the jury to find for him on his claims. As such, Defendant BNSF is entitled to judgment as a matter of law under FRCP 50.

Dated:  February 27, 2019                                    Respectfully submitted,


By**:** /s/Martin K. LaPointe


Martin K. LaPointe (ARDC 6195827)
Susan M. Troester (ARDC #6238264)
LaPointe Law, P.C.
1200 Shermer Road, Suite 310
Northbrook, Illinois 60062
Telephone: 847-786-2500
Facsimile: 847-786-2650

# CERTIFICATE OF SERVICE

      The undersigned attorney hereby certifies that, on February 27, 2019, he caused a copy of the foregoing **DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW** to be filed electronically with the Clerk of the Court using the ECF system, which will send notification of such filing to all attorneys of record via email.

                                                                         /s/ Martin K. LaPointe