**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| RON MORRIS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 15 CV 2923 |
| | ) | |
| v. | ) | |
| | ) | |
| BNSF RAILWAY COMPANY | ) | Honorable Matthew F. Kennelly |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S FED. R. CIV. P. 50(B)
MOTION FOR JUDGMENT AS A MATTER OF LAW**

Defendant BNSF Railway Company ("BNSF"), by its attorneys, hereby moves, pursuant to Fed. R. Civ. P 50(b), for judgment as a matter of law.

**ARGUMENT**[1]

**A. Plaintiff introduced no evidence of racial discrimination.**

    **1. Plaintiff presented no evidence that BNSF treated any similarly situated employee outside his protected class more favorably.**

For an individual to be similarly situated to the plaintiff, the individual must be "*directly comparable to her or him in all material respects.*" *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 507 (7th Cir. 2017) (emphasis added). The Plaintiff has the burden to prove the individuals are similarly situated in that they (1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct "*without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.*" *Skiba v.*

---

[1] Under Fed. R. Civ. P 50(b), a court must "decide whether the jury had 'a legally sufficient evidentiary basis' for its verdict." *May v. Chrysler Grp., LLC*, 716 F.3d 963, 971 (7th Cir. 2013). Judgment as a matter of law should be rendered if "on the basis of the admissible evidence, no rational jury could have found for the prevailing party." *Stragapede v. City of Evanston*, 865 F.3d 861, 865 (7th Cir. 2017). When a party "has been fully heard on an issue and there is no legally sufficient basis for a reasonable jury to find for the party on that issue," judgment as a matter of law is proper. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149 (2000).

*Ill. Central R.R. Co.*, 884 F.3d 708, 723 (7th Cir. 2018) (emphasis added), citing *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002)(court cannot compare employer's treatment of plaintiff and a coworker if plaintiff fails to meet burden of establishing coworker is similarly situated); *see also, Mourning v. Ternes Packaging, Indiana, Inc.,* 868 F.3d 568, 571 (7th Cir. 2017). Plaintiff introduced no evidence that any employee engaged in similar conduct, and was disciplined by the same supervisor, without any differentiating or mitigating circumstances that would distinguish their conduct or the discipline administered.

      **a. <u>None of the alleged comparators engaged in conduct of comparable seriousness.</u>**

As indicated, a key requirement for a disparate discipline case is that the alleged comparators must have "engaged in conduct of comparable seriousness." *Coleman v. Donahoe*, 667 F.3d 835, 851 (7th Cir. 2012). Plaintiff had to do more than simply show that other employees were charged with violating the same rule or the same number of rules—he had to prove that the alleged comparators engaged in misconduct of *comparable seriousness. Skiba*, *supra*; *Weber v. Univs. Research Ass'n, Inc.*, 621 F.3d 589, 595 (7th Cir. 2010) ("None of the men…identified as comparators violated [the employer's] policy to *the degree* that [plaintiff] did"); *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 896-97, 899 (7th Cir. 2018) (burden is on plaintiffs to produce evidence of a disparity and of any unusual circumstances, mitigating factors, or other differences that would make the comparison "inapt").

In *Opsatnik v. Norfolk Southern Corp.*, 335 F. App'x 220 (3rd Cir. 2009), for example, the court found plaintiff—an engineer who violated a speeding restriction while operating a key train—was not similarly situated to proposed comparators who were also disciplined for excessive speed violations. The railroad discharged the plaintiff for failing to properly secure a locomotive, improper train handling, and excessive speed. *Id.* at 221. The plaintiff presented 24 current and former employees' career service records. *Id.* at 222. The Third Circuit held that the

plaintiff could not compare himself to employees in other divisions who committed non-operational violations because such violations "cannot be considered of 'comparable seriousness' to an operational violation such as speeding, especially when the violation involved operating a 'key train' carrying hazardous materials." *Id.* at 222-23. Moreover, the court found that the 4 of 24 alleged comparators who—like the plaintiff—were disciplined for excessive speed violations were *not* similarly situated because their "speed violations…were either the first operational violations committed by the employees whatsoever, or the first during the relevant period, and *none involved the transportation of hazardous materials*." *Id.* at 224 (emphasis added).

In *Hogroe v. BNSF Railway Co.*, 2018 WL 6696563 (N.D. Ill. Dec. 20, 2018), Judge Durkin granted summary judgment for BNSF on Hogroe's race discrimination claims. Like Morris, Hogroe was represented by Ed Fox & Associates, and Hogroe introduced some of the same comparators that Morris introduced here (Hesse, Dolan, DeEmo). Pl. Hendrickson Dep. 203-04, 209-10, 228-30. Judge Durkin quoted PEPA and found Hogroe was terminated for a Stand-Alone Dismissible offense. Like Morris, Hogroe was operating a key train. Hogroe ran the train through a locked fence causing damage to the fence, and forcing two co-workers to jump from the train. Judge Durkin ruled that the seven alleged comparators that Hogroe proffered were not comparable, reasoning, in part, that Hogroe, unlike his comparators, was operating a key train. *Hogroe,* 2018 WL 6696563 at *5 (risk that hazardous material might explode or contaminate land and water is an additional material difference between Hogroe's conduct and that of the comparators).

As both *Opsatnik* and *Hogroe* recognized, the fact that Plaintiff was operating a Key Train carrying hazardous materials when he committed a Stand-Alone Dismissible offense *is* a material difference. It makes the conduct of the others not of comparable seriousness. BNSF was not required to show that PEPA expressly treated violations involving trains carrying hazardous

materials as being more serious—an employer's policy cannot contemplate all possible degrees of seriousness, nor does the law require them to do so.[2] What matters is whether the *conduct* is similar enough "to eliminate other possible explanatory variables." *Skiba*, 884 F.3d at 723. The conduct Plaintiff pointed to is not.

BNSF terminated Plaintiff because on March 7, 2013: (1) he committed two separate FRA de-certifiable speeding violations; (2) while operating a Key Train, (3) each of those FRA de-certifiable offenses was a Serious violation under the Policy for Employee Performance Accountability ("PEPA"); (4) he failed to self-report either violation; and (5) the two "Serious violations during the same tour of duty" constituted a Stand-Alone Dismissible offense under PEPA. J. Exs. 9, 29. Plaintiff admitted to this conduct. Specifically, he testified that:

- On 3/7/13, he was operating a hazardous materials Key Train that contained 86 cars of crude oil—a hazardous material

- Morris's train sped through a Form A speeding when the train traveled at 40 miles per hour, 10 miles per hour over the limit (going 10 miles per hour or over a speed restriction is an FRA de-certifiable offense)

- 52 minutes later, Morris and Jones committed a second speeding violation at Mored siding (entering the siding at 12 miles per hour over limit), another FRA de-certifiable speeding violation

- As the Conductor, Morris was in charge of the train and had the duty to warn Engineer Jones about flags, signals, and speed restrictions

- In violation of rules, Morris also did not self-report either speeding incident

Morris Trial Tr. 97-100, 105-06, 116-17; *see also* BNSF Hendrickson Dep. 70-72, 74-79; Pl. Hendrickson Dep. 78-80; J. Exs. 9, 29.

---

[2] *See Harris*, 666 F.3d at 449 ("We have repeatedly said we do not sit as a super-personnel department to determine which employment infractions deserve greater punishment. It is enough that the misconduct that led to the adverse job action in question is sufficiently distinct to render the proposed comparators not similarly situated."); *Weber*, 621 F.3d at 594 (noting the employer "could reasonably view using company resources to further an outside business"—the plaintiff's violation—"as more offensive to the company's policy than simply wasting company time"); *Perez v. Illinois*, 488 F.3d 773, 777 (7th Cir. 2007) ("While

Plaintiff argued that because BNSF treated 24 Caucasian employees who also violated one or more of BNSF's rules more favorably, the jury could infer that his discharge was discriminatory. At a minimum, under Seventh Circuit standards, Plaintiff had to prove each comparator had two or more separate incidents of serious rule violations like Morris, operated a key train (a significant decision consideration as evidence by Andrea Smith's e-mail), and the same decision-makers (Smith, Jason Jenkins, Rob Reilly, and the conducting officer). Again, simply showing that others violated certain rules is insufficient. *Harris v. Warrick Cnty. Sheriff's Dep't*, 666 F.3d 444, 449 (7th Cir. 2012) (The "employees receiving more lenient disciplinary treatment must at least share a comparable set of failings.").[3] Plaintiff presented no evidence at trial that any of the 24 alleged comparators committed a Stand-Alone Dismissible violation under PEPA, including "multiple Serious violations committed during the same tour of duty." Importantly, the issue is not the number of rules violated. It is whether the employee committed more than one offense BNSF treats as "Serious" under PEPA.

Plaintiff introduced Employee Transcripts, Alternative Handling records, and Investigation Waivers for 24 alleged "comparators," along with Hendrickson's limited testimony about those documents. But Plaintiff failed to lay a proper foundation for these records, none of which actually explain or provide any detail regarding what each alleged comparator did or why BNSF assessed the particular level of discipline. The records contain only cursory descriptions of the rules BNSF concluded the employee violated, with no mention of circumstances that shows

---

identical rule violations may be helpful in determining whether there has been discrimination, it is not dispositive of similarity.").

[3] *See also Johnson*, 892 F.3d at 896 (even if alleged comparator received more favorable treatment, "without knowing whether they were similarly situated, a court has no way of discerning whether this information is relevant to a claim of race discrimination."); *Gaines v. K-Five Const. Corp.*, 742 F.3d 256, 262 (7th Cir. 2014) (proposed comparator not similarly situated where his violation of same rule was "trivial").

their conduct was indistinguishable from Plaintiff's. No witness testified as to what any of the 24 employees did and why BNSF assessed the discipline it did.[4]

Hendrickson testified that after reviewing the documents, he could not discern whether any of the 24 people (1) engaged in Stand-Alone Dismissible events, (2) committed two Serious incidents during a single tour of duty, or (3) committed a violation while operating a Key Train. Pl. Hendrickson Dep. 252:17-253:3, 254:3-9; *see also* BNSF Hendrickson Dep. 16, 24. That none of them went through a discipline investigation hearing and BNSF's process for review of potential dismissal cases (involving Smith, General Manager Jason Jenkins, and Vice-President Rob Reilly) means also that the decision-makers in the 24 comparators were not identical (and this a Seventh Circuit requirement). The jury could not reasonably have concluded the 24 comparators were similarly situated under governing Seventh Circuit standards. Failure of proof in this case inexorably means Plaintiff failed to meet his burden to show disparate treatment.[5] And Plaintiff proffered no other evidence to prove discrimination.

<u>None</u> of the records established that any employee (1) engaged in a Stand-Alone Dismissal violation under PEPA, (2) while operating a Key Train, and (3) failed to report the two Serious violations to BNSF.[6] Andrea Smith specifically noted *each of these factors* when she conveyed her recommendation that dismissal was the appropriate discipline for Morris. D. Ex. 28. To suggest, as Morris's counsel did to the jury, that at least one of the 24 comparators *could*

---

[4] *See Hossack v. Floor Covering Assocs. Of Joliet, Inc.*, 492 F.3d 853, 861 (7th Cir. 2007) (affirming grant of judgment as a matter of law for employer: "no reasonable jury could have found that [the plaintiff] was a victim of intentional discrimination without engaging in speculation").
[5] *See Runyon v. Applied Extrusion Techs., Inc.*, 619 F.3d 735, 740-41 (7th Cir. 2010) (granting judgment as a matter of law for employer after plaintiff's case in chief because "no jury could fail to see the differences" in the proposed comparators: "It is important to recall that it was [the plaintiff's] burden to show that age was the real reason for his firing, not [the employer's] burden to show that it was not.").
[6] *See, e.g., Dotson v. AT & T Servs., Inc.*, 524 F. App'x 271, 274 (7th Cir. Apr. 11, 2013) (other employee "not a suitable comparator because he, unlike the plaintiff, complied with company policy by reporting his arrest immediately upon returning to work"); *Henry v. Jones*, 507 F.3d 558, 566 (7th Cir. 2007)

have been deemed to have committed two Serious violations in the same train run is precisely what the law does not permit the trier-of-fact to do as a "super personnel department."[7]

### b. The same decision-makers were not involved.

Although the cases discussing comparator evidence often mention the need for the employees to have the same "supervisor," the Seventh Circuit clarified this to mean the same decision-maker: "[w]hile we have sometimes phrased the question ambiguously as whether the comparators dealt with the same supervisor, the real question is whether they were treated more favorably by the same decisionmaker." *Coleman*, 667 F.3d at 848.[8]

In Morris's case, four BNSF managers individuals played a role with respect to BNSF's ultimate dismissal decision. They were:

- Hearing Officer Brett Russell—recommended Level S and probation
- PEPA Team/Labor Relations Andrea Smith—recommended dismissal
- Division General Manager Jason Jenkins—agreed with dismissal recommendation
- Regional VP of Operations Rob Reilly—made final decision to dismiss

Morris introduced no evidence that any of these individuals were involved with any of the disciplinary decisions for the 24 alleged comparators. Andrea Smith was the first to recommend Morris's dismissal, and there is no evidence that she was involved with the discipline for *any* of the 24 alleged comparators. And Plaintiff presented no evidence that Brett Russell, Jason Jenkins or Rob Reilly had any involvement with any of these 24 individuals. In short, because there is simply no evidence in the record that any of the Morris decision-makers were decision-makers

---

(where plaintiff's conduct is more "egregious" than that of the alleged comparators he highlights, he "has not put forth evidence sufficient to support a finding that his employer tailored its expectations to race").

[7] *See e.g. Grant v. Trustees of Indiana Univ.*, 870 F.3d 562 (7th Cir. 2017); *Riley v. Elkhart Community Schools*, 829 F.3d 886 (7th Cir. 2016); *Coleman*, 667 F.3d at 862 ("In adjudicating claims under federal employment discrimination statutes, a court does not sit as a super-personnel department, second-guessing an employer's business decision as to whether someone should be fired or disciplined because of a work-rule violation.").

[8] *See also Ellis v. United Parcel Serv., Inc.*, 523 F.3d 823, 826 (7th Cir. 2008) ("to be similarly situated, a [comparator] must have been treated more favorably by the same decisionmaker").

for any of the 24 comparators, there was no valid legal basis, under well-established Seventh Circuit law, to permit a comparison of any of the 24 alleged comparators to Morris.[9]

### c. Plaintiff's unsubstantiated arguments regarding "waiver" and "Alternative Handling" do not save his case.

At trial, Plaintiff's counsel repeatedly argued to the jury that BNSF treated Plaintiff less favorably than other similarly situated employees because those employees, unlike Plaintiff, "got a waiver," "received a waiver" or were granted Alternative Handling. Plaintiff's counsel also suggested that "waiver" resulted in the alleged comparators receiving more lenient discipline. Even viewing the case through that theory—that the alleged discrimination occurred with respect to waiver or Alternative Handling rather than the adverse action the jury was about (his termination)—would not help Plaintiff. That is so because he did not identify any employee who committed the same or more serious violations who requested a waiver or Alternative Handling and received it.[10] That is, he did not point to an appropriate comparator with respect to waiver or Alternative Handling.[11] Nor has he shown that the same decision-makers who allegedly denied him the ability to submit a waiver or obtain Alternative Handling were the same ones involved with the purported comparators. Therefore, he did not show discrimination with respect to those alleged acts.

---

[9] *See, e.g., Ellis v. United Parcel Serv., Inc.*, 523 F.3d 823, 826 (7th Cir. 2008) (purported comparators not similarly situated where they were not subject to the same decision-maker as the plaintiff when they purportedly violated the policy at issue); *Montgomery v. American Airlines, Inc.*, 626 F.3d 382, 395 (7th Cir. 2010) (not similarly situated where enforcement of policy at issue depended on decision-maker and same decision-maker not present during proposed comparator's probationary period).

[10] *See Johnson,* 892 F.3d 887, 895 (7th Cir. 2018) ("Evidence of what has happened to other employees is only relevant if that employee is in the same boat as the plaintiff."); *Montgomery, Inc.*, 626 F.3d at 395 (not similarly situated where proposed comparator's differential treatment due to a non-discriminatory reason—union intervention to correct erroneous probationary time calculation).

[11] Another distinguishing feature with respect to Alternative Handling is that Plaintiff requested it a full month after his violations. There is no evidence that anyone received Alternative Handling with such a delayed request, and Hendrickson testified he is unaware of any employee receiving Alternative Handling under similar circumstances. BNSF Hendrickson Dep. 14.

Moreover, Plaintiff's arguments about waiver completely misconstrue and misrepresent the term "waiver." Waiver is an *employee electing* to waive his or her rights under the collective bargaining agreement ("CBA"), including the right to an investigative hearing, and agreeing to accept whatever discipline BNSF imposes for the relevant rule violation(s) pursuant to PEPA. Critically, a waiver is *not* a "get out of jail free card," handed out to excuse violations on a manager's whim. It is the *employee* waiving rights to the procedural protections of the CBA. Plaintiff's counsel's repeated insinuations to the contrary are not evidence. In fact, there is no *evidence* in the record indicating that "waiver" constitutes or results in leniency. Rather, the only evidence is that the employee receives and accepts the discipline assigned by PEPA to the violation. J. Ex. 27; BNSF Hendrickson Dep. 16-19.[12]

### 2. There was no other evidence of race discrimination.

Plaintiff presented no other purported evidence that BNSF subjected him to race discrimination. BNSF, on the other hand, showed that (1) Caucasian Trainmaster Brett Russell knew Plaintiff's race and recommended that BNSF not dismiss Plaintiff, but instead issue him a Level S with a 30-day record suspension and probationary period; (2) Hendrickson did not know his race and made no recommendation with regard to his discipline (BNSF Hendrickson Dep. 6-9, 83-84, 96; D. Ex. 52); (3) Andrea Smith was the first BNSF manager to recommend that BNSF terminate Plaintiff—and there is no evidence she knew his race (*See* Trial Tr. 116-18); and (4) there is no evidence Jason Jenkins and Rob Reilly, who made the final discipline decisions, were aware of Plaintiff's race. Tom Lynch, a Caucasian employee, was terminated twice—while Hendrickson was the Superintendent of Operations—and denied Alternative

---

[12] Furthermore, the evidence that Plaintiff even asked for waiver is sketchy at best and does not rise to the level of a preponderance of the evidence to support the verdict. The waiver process was handled through the union representative who did not testify and there was no evidence – again, other than vague self-serving testimony – that a waiver was sought. Indeed, when the union representative emailed asking for

Handling, like Plaintiff, after engaging in conduct that implicated BNSF's Critical Work Practices. Pl. Hendrickson Dep. 40-41; BNSF Hendrickson Dep. 88-90; Trial Tr. 154-55, 159-60, 162-64. Ruth McCullum (African American), the Director of Administration and Hendrickson's peer, sent the Alternative Handling denial letters and determined that Morris was ineligible for Alterative Handling. Pl. Hendrickson Dep. 40-41, 71-72; BNSF Hendrickson Dep. 88-90. In short, there is zero evidence of racial *animus*.

## B. The Railway Labor Act ("RLA") precludes Morris' Alternative Handling and Waiver Arguments.

It is well-established that the RLA precludes claims brought under state or federal law that, in reality, assert rights vested in a CBA. *Tice v. American Airlines, Inc*., 288 F.3d 313, 316-17 (7th Cir. 2002). If the "heart of the dispute" is "a disagreement over the interpretation" of the CBA, the dispute must be resolved through arbitral boards established under the RLA. *Id*. at 316; *Brown v. Illinois Central R.R. Co.,* 254 F.3d 654, 664 (7th Cir. 2001).

Plaintiff argued that BNSF applied the CBA disciplinary provisions in a disparate manner. Specifically, he claims BNSF afforded other conductors and engineers Alternative Handling, as permitted under the Safety Summit Agreement between his union and BNSF, and allowed others to exercise their right, under the Memorandum of Agreement between BNSF and United Transportation Union, to waive their right to investigation, appeal and arbitration, in exchange for accepting fault and the resultant discipline. J. Exs. 26, 27. Those measures are established through and are part of BNSF's CBA with Morris's union.

Plaintiff's theory depends on his contractual *entitlement* to submit a waiver or obtain Alternative Handling. Determining whether Morris was entitled to Alternative Handling or to

---

Alternative Handling, had Plaintiff really wanted waiver surely the representative would have said so in that email. See J. Ex. 28.

waive his CBA rights necessarily requires an interpretation of the CBA.[13] That means the Court lacks jurisdiction over that part of the case. *Tice,* 288 F.3d at 313; *Brown*, 254 F.3d at 664; *see also Brisbois v. Soo Line R.R.*, 124 F.Supp. 3d 891, 987 (D. Minn. 2015).

For instance, with alternative handling the jury had to decide whether, pursuant to the CBA, the conduct in which Morris and the purported comparators engaged would have allowed for alternative handling. BNSF contends he was not entitled to it because his violations concerned Critical Work Practices. *See* J. Ex. 2. Thus, to even begin to determine whether BNSF should or should not have granted alternative handling to Morris, the jury would have had to review and interpret the terms of the Safety Summit Agreement/CBA. The same is true for waiver; the jury would have had to interpret the terms of the agreement to determine whether Morris and/or the purported comparators were eligible. But the RLA precludes courts or juries from engaging in that interpretation of agreements. The judgment based on exactly that therefore cannot stand.

**C. Plaintiff Failed to Present Any Evidence to Establish Compensatory Damages**

Morris testified that after his dismissal from BNSF, his car was repossessed, he was evicted, and he lived with different family members. Morris Trial Tr. 82-83, 90-91. He also testified that when he learned he was terminated, he felt "shock, anger and confusion" and was confused because he did not receive Alternative Handling or waiver. *Id.* at 91-93. When asked to describe how he feels about his life today as compared to how he felt about his life before he was dismissed, he testified:

> "Well, I was far more established. And what I – basically what I did is, actually, my children. My thing was to establish them to have a productive life; the schooling, the nice area to live in. So I accepted the way of life with the company to make a productive life, to make a productive life for my children. And, right now, I'm at a standstill with that."

---

[13] *Tice*, 288 F.3d at 316 ("This is a disagreement over the meaning of the collective bargaining agreement. The plaintiffs claim certain rights under it and the airline denies they have those rights.")

Morris Trial Tr. 93-94. There was no other evidence that bears on alleged emotional distress.

A plaintiff is not required to introduce evidence from medical professionals to support a claim for emotional distress damages, but Morris must prove his emotional distress damages by a preponderance of the evidence and it cannot be based on speculation and guesswork. *Farfaras v. Citizens Bank & Trust of Chicago*, 433 F.3d 558, 566 (7th Cir. 2006); *Tullis v. Townley Eng'g & Mfg. Co.*, 243 F.3d 1058, 1068 (7th Cir. 2001). To meet his burden, plaintiff must present some evidence about the emotional impact on the plaintiff of an employer's alleged discriminatory act.[14] Plaintiff's testimony was not akin to that of other plaintiffs. It thus was insufficient to support an award.

In closing argument, Plaintiff's counsel recommended the jury award Plaintiff compensatory damages in the range of $325,000 to $375,000; the jury awarded Plaintiff $375,000. Trial Tr. 340. But there was no evidentiary basis for awarding *any* compensatory damages. Morris did not (1) testify at all about the emotional impact of his dismissal or (2) describe any emotional distress or physical symptoms of any kind–stating that he felt "shock, anger and confusion" is insufficient. To the extent Morris suffered losses from a car repossession and eviction, those losses are covered by the back pay awarded by this Court and in any event are not within the compensatory damages instruction. *See* Dkt. 230, p11. There was no basis for awarding compensatory damages.

---

[14] *See e.g. Tullis*, 243 F.3d at 1068 (plaintiff testified "There was one minor incident with my back and it was like I was useless to them anymore. I wasn't what I was. I was a hassle." He "felt low." "I felt totally degraded and totally like all I done there was useless." He felt "backstabbed."); *Sanchez v. Catholic Bishop of Chicago,* No. 16 C 6983, 2018 WL 6192205, at *11 (N.D. Ill. Nov. 27, 2018) (plaintiff "stopped participating in activities she had previously enjoyed, had difficulty sleeping, gained weight, and

**D. The Record Does Not Support the Award of Punitive Damages.**

The jury awarded $500,000 in punitive damages. There was no basis for doing so and this award must be stricken. To support an award of punitive damages, Morris had to present evidence that BNSF discriminated against him with malice or reckless indifference to the law, *i.e.,* that BNSF acted "in the face of a perceived risk that its actions [violated] federal law." *See* 42 U.S.C. § 1981a(b)(1); *Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1025 (7th Cir. 2016); *Kolstad v. Am. Dental Assoc.,* 527 U.S. 526, 536 (1999) "[A] positive element of conscious wrongdoing is always required." *May v. Chrysler Grp., LLC*, 716 F.3d 963, 974 (7th Cir. 2013). A violation of the statute alone is insufficient. *Kolstad*, 527 U.S. at 534. Because Morris presented no evidence supporting that standard, he did not make a threshold showing necessary to recover punitive damages, and the award must be stricken.

In *Gile v. United Airlines,* 213 F.3d 365, 375 (7th Cir. 2000), the jury awarded the plaintiff $500,000 in punitive damages in an ADA case. The Seventh Circuit reversed, finding the defendant's actions may have amounted to "negligence," but the employer "did not exhibit the requisite reckless state of mind" sufficient to warrant punitive damages. *Id.* Likewise, in *May*, the Seventh Circuit upheld the district court's decision to vacate a $3.5 million punitive damages award. 716 F. 3d at 974. The Seventh Circuit noted that the punitive damages verdict "was without a legally sufficient evidentiary basis" and that "the district court was correct to conclude that the evidence is simply insufficient to support a finding that Chrysler acted with "malice or reckless indifference" to May's "federally protected rights." *Id.*

*Gile* and *May* apply here. Plaintiff introduced *no* evidence to the jury that would allow it to reasonably conclude that BNSF acted with "malice or reckless indifference." There was no testimony at trial, at all, on this subject. Contrary to Plaintiff's counsel's assertion, there was no

---

lost touch with friends."); *David v. Caterpillar*, 185 F.Supp.2d 918 (C.D. Ill. 2002) (plaintiff "felt

evidence of disciplinary racial disparity by Hendrickson or "under his watch," whatever that means, Trial Tr. 302, and this assertion most certainly does not show a "positive element of conscious wrongdoing," which "is always required" to assess punitive damages. *May*, 716 F.3d at 974, *quoting Kolstad*, 525 U.S. at 538. As discussed above, Hendrickson was not even involved in any of the disciplinary decisions involving the 24 alleged comparators and, in most cases, was unaware of their race. BNSF Hendrickson Dep. 80-81; Pl. Hendrickson Dep. 239-248. There was simply no evidentiary basis for the jury's finding that BNSF acted with malice or reckless indifference in terminating Morris's employment, especially with his own admissions of wrongdoing and that BNSF followed its PEPA policy in doing so.

Even if the standard is satisfied, if an employer makes good faith efforts to comply with employment laws, including implementing strong EEO policies and procedures, an assessment of punitive damages is improper. *Kolstad* 527 U.S. at 545-46. At trial, BNSF showed it has a comprehensive EEO Policy <u>and</u> a Code of Conduct, which prohibit discrimination, harassment and retaliation based on race, and other protected categories and that BNSF requires managers to train on the policies every year and non-managers to train every other year. BNSF Hendrickson Dep. 56-63; D. Ex. 17, J. Ex. 5. BNSF's policies direct employees to report complaints to their supervisor, human resources or, anonymously, through a 24-hour hot-line. *Id.*; D. Ex. 17. The EEO Policy and Code of Conduct are available to employees through BNSF's intra-net. BNSF Hendrickson Dep. 59-60. Thus, the evidence demonstrated that any discriminatory employment decisions by BNSF's managers would be contrary to BNSF's good faith efforts to comply with federal anti-discrimination laws and, thus, would not support a punitive damage award.

---

robbed," "felt cheated," had difficulty sleeping, and experienced stomach aches).

## **CONCLUSION**

For the reasons set forth herein, the Court should grant judgment in BNSF's favor as a matter of law.

Dated: April 4, 2019 　　　　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　　　　　By: /s/Martin K. LaPointe

Martin K. LaPointe (ARDC#6195827)
Susan M. Troester (ARDC #6238264)
LaPointe Law, P.C.
1200 Shermer Road, Suite 310
Northbrook, Illinois 60062
Telephone: 847-786-2500
Facsimile: 847-786-2650

Bryan P. Neal (ARDC # 90786080)
Thompson & Knight LLP
One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, TX 75201-2533
Telephone: 214-969-1762
Facsimile: 214-880-3205

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that, on April 4, 2019, he caused a copy of the foregoing **DEFENDANT'S FED. R. CIV. P. 50(B) MOTION FOR JUDGMENT AS A MATTER OF LAW** to be filed electronically with the Clerk of the Court using the ECF system, which will send notification of such filing to all attorneys of record via email.

/s/ Martin K. LaPointe