**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **RON MORRIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 15 C 2923** |
| | ) | |
| **BNSF RAILWAY COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**CORRECTED
MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

Ron Morris sued his former employer BNSF Railway, alleging that he was terminated because of his race in violation of Title VII and 42 U.S.C. § 1981. After trial, the jury found in Morris's favor and awarded him compensatory damages of $375,000 and punitive damages of $500,000. BNSF has moved for judgment as a matter of law or alternatively for a new trial. For the reasons set forth below, the Court grants BNSF's new trial motion to the extent that it seeks remittitur of the award of compensatory and punitive damages but otherwise denies the motions.

**Background**

Beginning in 2004, Morris worked as a conductor for BNSF for nine years. On March 7, 2013, while Morris was operating a train between the Illinois cities of Savanna and Aurora, he sped through multiple restricted-speed areas in violation of BNSF's General Code of Operating Rules. He also failed to report these violations as required by the rules.

BNSF discovered these violations several days later when it performed a review of the locomotive event recorder.  In April, the company held a formal investigation hearing led by Division Trainmaster Brett Russell.  Russell recommended charging Morris with six violations of the General Code of Operating Rules and suspending him for thirty days, followed by a review period of thirty-six months.

Morris's supervisor, Scott Hendrickson, shared the investigation hearing transcript and Russell's recommendation with Andrea Smith, a member of BNSF's disciplinary committee.  Smith recommended firing Morris, noting that his multiple violations during one run constituted a stand-alone dismissible violation under BNSF's Policy for Employee Performance Accountability.  Morris was fired on April 30, 2013.

Morris, who was a member of the United Transportation Union, appealed his dismissal to a board of neutral arbitrators pursuant to the collective bargaining agreement between the BNSF and the Union.  After the arbitrators upheld his dismissal, he filed a complaint with the Illinois Department of Human Rights and the United States Equal Employment Opportunity Commission.

Morris brought this suit alleging that BNSF wrongfully discharged him because of his race in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981.[1] After the Court denied BNSF's motion for summary judgment, *see Morris v. BNSF Ry.*

---

[1] Because the two statutes "have the same liability standards," *Walker v. Abbott Labs.*, 340 F.3d 471, 474 (7th Cir. 2003), the Court will consider the claim under section 1981 and the claim under Title VII together.  The only pertinent distinction between the two provisions is that claims under Title VII are subject to statutory limitations on damages, while claims under section 1981 are not.  *See* 42 U.S.C. §§ 1981a(b)(3), (b)(4); *Baines v. Walgreen Co.*, 863 F.3d 656, 661 n.1 (7th Cir. 2017).  But because Morris asserted section 1981 as "a basis for recovery, the Title VII cap on compensatory and punitive damages does not apply."  *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1064 (8th Cir. 1997).

*Co.*, No. 15 C 2923, 2018 WL 4742105 (N.D. Ill. Oct. 2, 2018), the case proceeded to trial. After the four-day trial, the jury found in Morris's favor and awarded $375,000 in compensatory damages and $500,000 in punitive damages.

The Court then held a bench trial on the issues of reinstatement, back pay, and front pay. The Court overruled BNSF's defense of failure-to-mitigate with respect to the award of back pay (which amounted to $531,292 including wages, prejudgment interest, pension contributions, and health insurance benefits) but declined to order reinstatement. Dkt. no. 235. Based on the parties' submissions proposing front-pay calculations, the Court awarded front pay of $137,450. Dkt. no. 239.

BNSF has moved for judgment as a matter of law or alternatively for a new trial. It contends that Morris' evidence is insufficient to support the verdict—specifically, that he did not point to similarly situated non-African-American employees who were treated more favorably. BNSF also argues that it is entitled to judgment as a matter of law on the issue of damages or, in the alternative, that the Court should order a remittitur because the jury's award of compensatory and punitive damages is excessive. Finally, BNSF contends that a new trial is warranted based on this Court's decisions excluding the testimony of certain late-disclosed defense witnesses and because the Court declined to include a proposed jury instruction.

## Discussion

Judgment as a matter of law is appropriate if "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1); *Martin v. Milwaukee County*, 904 F.3d 544, 550 (7th Cir. 2018). The Court

3

may not assess credibility or weigh evidence, and it must "construe the evidence in favor of the party who won before the jury." *Martin*, 904 F.3d at 550.

Under Federal Rule of Civil Procedure 59, the party seeking a new trial must show that the verdict is against the clear weight of the evidence or the trial was unfair to the moving party. *Martinez v. City of Chicago*, 900 F.3d 838, 844 (7th Cir. 2018). "[A] court will set aside a verdict as contrary to the manifest weight of the evidence only if no rational jury could have rendered the verdict." *Whitehead v. Bond*, 680 F.3d 919, 928 (7th Cir. 2012) (alteration in original). In making this determination, the Court "has the power to get a general sense of the weight of the evidence, assessing the credibility of the witnesses and the comparative strength of the facts put forth at trial." *Id.*

Because BNSF supports its new trial motion with the same arguments it advances in support of its motion for judgment as a matter of law, the Court will consider them together.

**A.      Comparator evidence**

BNSF's first set of arguments concerns the evidence presented at trial regarding similarly situated non-African-American employees who were not fired. BNSF contends that these comparators did not engage in misconduct sufficiently similar to Morris's to furnish a legally adequate comparison. It also argues that Morris did not point to evidence that the comparators were disciplined by the same decisionmakers as he was and that the evidence concerning BNSF's procedures for waiver and alternative handling does not bolster the comparator evidence. The Court addresses each argument in turn.

### 1.     Comparable conduct

BNSF contends that Morris did not introduce evidence that the comparators engaged in sufficiently serious misconduct to be similarly situated to Morris. The Court addressed this issue in its summary judgment ruling and rejected BNSF's nearly identical arguments. *See Morris*, 2018 WL 4742105, at *3–4. The Court reiterates that comparators "need only be similar enough to enable a meaningful comparison." *Coleman v. Donahoe*, 667 F.3d 835, 848 (7th Cir. 2012) (internal quotation marks omitted).

BNSF emphasizes that Morris was operating a "key train"—i.e., one carrying hazardous materials—and that the comparators were not. But as the Court previously ruled, BNSF pointed to no evidence that it generally treats violations relating to key trains differently than other serious rule violations for disciplinary purposes. *See Morris*, 2018 WL 4742105, at *4. BNSF relies on a recent Seventh Circuit case, *Graham v. Arctic Zone Iceplex, LLC*, 930 F.3d 926 (7th Cir. 2019), to argue that it was not required to show that its written policies imposed more severe sanctions for key-train violations in order to distinguish the comparators on that basis. *See id.* at 930 (holding that an employer does not forfeit its right to rely on particular instances of misconduct in explaining its decision to terminate an employee merely because the employee was not formally reprimanded for his misconduct). But in *Graham*, the court considered only whether a jury could reasonably disregard evidence of the plaintiff's disciplinary history solely because he was not issued written reprimands. This case, by comparison, concerns BNSF's written policies, not particular instances of past discipline. The fact that the policies made no mention of key trains supports a reasonable inference that

BNSF itself considered the other employees' violations to be comparably serious. *See Coleman*, 667 F.3d at 848 (noting that the similarity of comparators depends in part on "whether the employer subjected them to different employment policies"). Moreover, unlike the plaintiff in *Graham*, Morris was not required to show that BNSF's "key train" explanation was false or pretextual; rather, he needed to establish only that the fact that he was operating a key train did not distinguish his violation so significantly that it precluded a meaningful comparison. *See id.* It would therefore be reasonable for a jury to reject this distinction as a basis on which to disregard the comparator evidence.

BNSF also points to a litany of specific circumstances surrounding Morris's termination: he committed two speeding violations in a single run of a key train, he failed to self-report those violations, and each of the violations could have led to decertification under the rules promulgated by the Federal Railway Administration. But the Seventh Circuit has made clear that "employees may be similarly situated to the plaintiff even if they have not engaged in conduct identical to that of the plaintiff." *Peirick v. Ind. Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 689 (7th Cir. 2007); *see also Coleman*, 667 F.3d at 850–51. Morris presented evidence that the comparator's violations were comparably serious even if they differed in some ways; for example, an employee named Kellan Smith was granted a waiver and kept his job after he intentionally disabled safety equipment on a train so that it could exceed speed limits. The jury then heard evidence that Hendrickson gave Smith waiver a second time after Smith committed a serious violation while on probation for the first offense. BNSF and Hendrickson attributed this leniency to the timing of Smith's firing—he was terminated in 2010, three years before Morris, when BNSF contends that it enforced its

policies less stringently—but the jury could have reasonably declined to credit this explanation given the relatively short interval between these events.

BNSF again cites the Seventh Circuit's recent decision in *Graham*, in which the court affirmed summary judgment for the defendant on the plaintiff's claim that he had been unlawfully terminated because of disability. The court explained that the only alleged comparator was not similarly situated to the plaintiff. The comparator had a "sterling employee record" and caused an accident that did not endanger the defendant's customers—in stark contrast to Graham, who had a record of misbehavior and who created a hazard to customers when he crashed a Zamboni. *Graham*, 930 F.3d at 930. *Graham* does not undermine Morris's comparator evidence in this case: BNSF has not pointed to evidence or even argued that Morris's disciplinary history was relevant to the decision to terminate him, and a jury could reasonably conclude that some of the comparators (including Kellen Smith, for example, who derailed a train after purposely disabling safety equipment to make it go faster) engaged in equivalently dangerous misconduct.

BNSF also argues, albeit in a fairly cursory fashion, that it is entitled to a new trial because the Court erroneously admitted evidence of employees who are not comparable, thus purportedly confusing the jury. But although BNSF objected to this evidence in its motions in limine, it did not make an argument based on jury confusion—rather, it argued that the evidence should be excluded because it was needlessly cumulative and legally insufficient (arguments the Court rejected as pertaining to weight rather than admissibility). BNSF thus forfeited its objection regarding jury confusion. *See Wilson v. Williams*, 182 F.3d 562, 567 (7th Cir. 1999) (explaining that Federal Rule

of Evidence 103(a)(1) "requires a litigant to state a specific ground for an objection to evidence; grounds not presented cannot be raised later . . . .").

Even if BNSF had not forfeited the point, the Court finds that the risk of confusion was minimal in the context of this case.  The evidence presented and issues to be determined at trial were not particularly complicated.  The central issue in the case—whether non-African-American employees were given more favorable treatment than Morris for comparable violations—required the jury to consider whether the other employees were similarly situated.  *See Coleman*, 667 F.3d at 846 ("Whether a comparator is similarly situated is usually a question for the fact-finder . . . ." ).  Far from confusing the issues or distracting the jury, the evidence to which BNSF objects went to the heart of the dispute.  That some of this evidence may not have been legally sufficient does not provide a basis to exclude it because BNSF has not shown that "its probative value is substantially outweighed by the danger of confusing the issues." *White v. Hefel*, 875 F.3d 350, 355 (7th Cir. 2017).

## 2.    Identity of decisionmakers

BNSF next argues that judgment as a matter of law or a new trial is warranted because Morris's comparators were not terminated at the behest of the same decisionmakers.  As the Court noted in its summary judgment opinion, the involvement of the same decisionmaker is usually required to support an inference of discrimination. *See Morris*, 2018 WL 4742105, at *4 (citing *Coleman*, 667 F.3d at 847).  But Morris has satisfied this standard through the testimony of the relevant decisionmaker, Scott Hendrickson.  Hendrickson testified that he was responsible for deciding whether to issue waiver or alternative handling when employees committed serious rule violations.

Morris presented evidence that some of the comparators were given waiver or alternative handling instead of being terminated, and Hendrickson stated that he could have exercised his discretion not to grant waiver or alternative handling in all of those cases. Hendrickson thus serves as a common denominator between Morris's termination and the discipline issued to similarly situated non-African-American employees.

BNSF points to the other supervisors involved in the decision to fire Morris and argues that Morris did not show that each of those individuals was involved with the disciplinary decisions of other comparators. This argument incorrectly presupposes that employees are not similarly situated unless *all* of the same decisionmakers were involved. *See Coleman*, 667 F.3d at 847 ("The similarly-situated requirement normally entails the existence of *a* common supervisor." (emphasis added) (internal quotation marks omitted)). Morris was required to prove only that one supervisor's discriminatory motive proximately caused his termination, not that every supervisor involved in that decision was motivated by racial animus. *See, e.g.*, *Staub v. Proctor Hosp.*, 562 U.S. 411, 419–20 (2011) (upholding, in an analogous statutory context, "cat's paw" liability, which allows the plaintiff to prevail by showing that one supervisor's discrimination caused his termination even if the ultimate decisionmaker did not engage in unlawful discrimination); *Hicks v. Forest Preserve Dist. of Cook Cty.*, 677 F.3d 781, 790 (7th Cir. 2012) (applying *Staub* to claims under Title VII). Moreover, if BNSF's argument were credited, it would be virtually impossible for employees in large organizations—which often rely on input from multiple decisionmakers in making personnel decisions—to introduce comparator evidence in Title VII cases. No authority supports this outcome.

Rather, the existence of one common supervisor who had the discretion, as Hendrickson did, to spare employees from termination makes the comparators sufficiently similar. *See Coleman*, 667 F.3d at 848 ("Under Title VII, a decisionmaker is the person responsible for the contested decision." (internal quotation marks omitted)).

Finally, BNSF argues that the jury's verdict was against the manifest weight of the evidence because neither Hendrickson nor the other supervisors responsible for the decision to fire Morris knew that he is African American. But Morris testified that he met Hendrickson in person on multiple occasions when Hendrickson learned Morris's name. This testimony provides a reasonable basis for the jury to find in Morris's favor on this point and to disbelieve Hendrickson's testimony that he did not know Morris's race. Thus insofar as the verdict required the jury to find that Hendrickson knew that Morris is African American, it is not against the manifest weight of the evidence.

### 3. Waiver and alternative handling

Finally, BNSF contends that the evidence concerning the procedures for waiver and alternative handling is insufficient to support the verdict under Rules 50 and 59. It argues that Morris did not introduce evidence supporting the inference that waiver and alternative handling result in less severe discipline. It contends to the contrary that although waiver and alternative handling cause employees to bypass certain investigative procedures, they do not lessen the punishments imposed.

BNSF's argument flies in the face of the trial evidence and common sense. First, Hendrickson expressly testified that the alternative handling process allowed employees to avoid dismissal. Hendrickson Dep. Vol. I, Morris's Ex. A., dkt. no. 264–1, at 25:23–26:4. And although he further testified that employees could still be dismissed if they

went through the waiver process, the jury could have reasonably refused to credit BNSF's argument that waiver did not result in less severe discipline. Other employees, such as Kellan Smith, committed multiple serious rule violations and were spared termination after being granted a waiver. And BNSF offers no explanation for why employees would subject themselves to a waiver procedure—whose terms apparently are not spelled out in any of BNSF's disciplinary policies—that conferred no benefits while depriving them of a full investigation and hearing. Especially in light of Hendrickson's contradictory statements concerning the alternative handling process, discussed later in this opinion, the jury was entitled to find in Morris's favor on this point and to discredit BNSF's argument that Morris would not have benefitted from waiver. *See Trade Well Int'l v. United Cent. Bank*, 825 F.3d 854, 861 (7th Cir. 2016) ("[A] court may find a witness incredible based on a variety of testimonial issues, such as a lack of specific details, implausibility, internal inconsistencies, as well as contrary evidence.").

Because Morris introduced evidence that non-African-American employees were given alternative handling or waiver despite committing violations of comparable seriousness, the jury permissibly inferred that he was fired for unlawful discriminatory reasons. *See Abrego v. Wilkie*, 907 F.3d 1004, 1013 (7th Cir. 2018) ("All things being equal, if an employer takes an action against one employee in a protected class but not another outside that class, one can infer discrimination."). The Court can discern no basis for concluding that this inference was contrary to the manifest weight of the evidence. BNSF therefore is not entitled to judgment as a matter of law or a new trial on the grounds that Morris's comparator evidence was insufficient.

**B.      Preemption**

BNSF argues that it is entitled to judgment as a matter of law because the Railway Labor Act (RLA) preempts claims involving the interpretation of collective bargaining agreements in the railroad industry.  *See Tice v. Am. Airlines, Inc.*, 288 F.3d 313, 314 (7th Cir. 2002) ("Arbitral boards established pursuant to the Railway Labor Act have exclusive jurisdiction to resolve disputes over the application of collective bargaining agreements in the railroad and airline industries.").  But RLA preemption applies to a claim brought under an independent federal statute "only if it can be dispositively resolved through an interpretation of a [collective bargaining agreement]." *Brown v. Ill. Cent. R.R.*, 254 F.3d 654, 668 (7th Cir. 2001).  "[T]he question is whether the plaintiffs' suit is dependent on their preferred interpretation of the agreement, in which event they should be in arbitration . . . ."  *Tice*, 288 F.3d at 315.

BNSF contends that whether Morris was eligible for alternative handling or waiver turns on the interpretation of the collective bargaining agreement.  But at trial the dispute over whether Morris qualified for those disciplinary alternatives did not involve the terms of the agreement at all.  The evidence about waiver concerned whether Morris in fact requested it and whether, as a practical matter, it constituted a benefit to the employees who received it.  Resolving those questions does not require the Court or the jury to resolve a dispute about the meaning of any term in the collective bargaining agreement but only to consider the facts of this specific case.  *See Bhd. of Maint. Way Emps. v. Burlington N. Santa Fe Ry. Co.*, 383 F. Supp. 2d 1000, 1008 (N.D. Ill. 2005) (noting that the cases finding RLA preclusion or preemption, including *Tice*, were ones "where the parties disagreed on the meaning of particular CBA terms").

BNSF also argues that it was necessary to interpret the agreement to determine whether Morris was eligible for alternative handling. But because BNSF offered shifting explanations for his purported ineligibility—first contending that he failed to accept responsibility for his misconduct, then asserting that he violated a "critical work practice"—the jury could have reasonably concluded that these explanations were pretextual. *See Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 726 (7th Cir. 2005) ("[O]ne can reasonably infer pretext from an employer's shifting or inconsistent explanations for the challenged employment decision."). The jury thus reasonably could have found for Morris on the issue of alternative handling without deciding whether he was ineligible by determining, based on BNSF's shifting explanations, that the proffered eligibility rationale was pretext.

Because Morris did not need to establish a particular interpretation of the collective bargaining agreement to show that he was discriminatorily denied waiver or alternative handling, the RLA does not preempt this case.

## C.   Damages

BNSF argues that the evidence presented at trial was insufficient to permit the jury to award either compensatory or punitive damages. Alternatively, it asks the Court to order a remittitur because the damages are excessive.

### 1.   Compensatory damages

The jury awarded Morris $375,000 in damages to compensate him for pain, suffering, and loss of enjoyment of life. BNSF first argues that Morris's testimony—the only evidence regarding the emotional harm he suffered—was too sparse to support any compensatory damages whatsoever.

13

This argument is unavailing. Although Morris's testimony about the mental and emotional consequences of his termination was fairly restrained, he explained that his car had been repossessed and that he had been evicted from his home as a result of the lost income. He stated that he had to rely on his friends and family for places to stay, which he said was "very hard" because he was not accustomed to asking for help. Trial Tr., Morris's Ex. C., dkt. no. 264–3, at 91:6–15. He also described his "shock, anger and confusion" at being fired, *id.* at 91:16–20, and stated that his ability to provide a good life for his children was at a "standstill," *id.* at 93:20–94:5. This evidence was sufficient to permit the jury to find that Morris's termination caused him significant mental and emotional distress. *See Gracia v. SigmaTron Int'l*, 842 F.3d 1010, 1022 (7th Cir. 2016) ("Juries are responsible for evaluating the credibility of witness who testify to emotional distress . . . ."). As the Seventh Circuit explained in *Gracia*, "brevity and self-control in a judicial proceeding need not be interpreted as a weak case." *Id.* at 1023. BNSF is therefore not entitled to judgment as a matter of law on the question of compensatory damages.

Whether the damages are excessive is a separate question. In determining if remittitur is appropriate, the Court considers three factors: "whether the award is 'monstrously excessive,' whether there is a rational connection between the award and the evidence, and whether the award is roughly comparable to awards made in similar cases." *Id.* In their briefs, the parties focus primarily on the comparison with other cases. The Seventh Circuit has explained that although comparable cases "provide a reference point that assists the court in assessing reasonableness[,] they do not establish a range beyond which awards are necessarily excessive. Due to the highly

14

fact-specific nature of Title VII cases, such comparisons are rarely dispositive."

*Farfaras v. Citizens Bank & Tr. of Chi.*, 433 F.3d 558, 566 (7th Cir. 2006).

The Court concludes that the damages in this case are somewhat excessive in light of the evidence adduced at trial and in comparison with similar cases in the Seventh Circuit. In *Deloughery v. City of Chicago*, 422 F.3d 611 (7th Cir. 2005), a Title VII failure-to-promote case, the Seventh Circuit affirmed this Court's decision reducing compensatory damages from $250,000 to $175,000.[2] *Id.* at 621. The Court based its decision on the "absence of evidence of symptomatology, the fact that Deloughery was not terminated, and comparable cases." *Deloughery v. City of Chicago*, No. 02 C 2722, 2004 WL 1125897, at *7 (N.D. Ill. May 20, 2004). The Court took particular note of the Seventh Circuit's decision in *Neal v. Honeywell Inc.*, 191 F.3d 827 (7th Cir. 1999), in which the court observed that damages of $200,000 would be excessive to compensate a plaintiff even for serious emotional problems resulting from discriminatory firing. *Id.* at 832.

In this case, Morris's testimony about the emotional and mental consequences of his termination, which was relatively limited in scope, does not rationally support an award that exceeds the $200,000 that the Seventh Circuit cautioned would be excessive in *Neal*, which if one accounts for inflation or other differences in valuation due to the intervening two decades, amounts to about $300,000 in current dollars.[3]

---

[2] According to a calculation tool made available by the U.S. Bureau of Labor Statistics, in May 2004, when this Court ordered a remittitur of Deloughery's compensatory damages, $175,000 was equivalent to about $234,000 at the time the jury in the present case reached its verdict. *See* CPI Inflation Calculator, https://data.bls.gov/cgi-bin/cpicalc.pl?cost1=175000&year1=200405&year2=201902 (last visited Aug. 21, 2019).
[3] In September 1999 (when *Neal* was decided) $200,000 was worth about $301,000 at the time of the jury's verdict. *See* CPI Inflation Calculator, https://data.bls.gov/cgi-

Although Morris described losing his home and his car, as well as the shock, anger, and confusion that attended his wrongful termination, there was no evidence at trial about ongoing psychological problems or associated physical symptoms.  In support of its argument that the damages the jury awarded were excessive, BNSF cites *Tullis v. Townley Engineering & Manufacturing Co.*, 243 F.3d 1058 (7th Cir. 2001), in which the Seventh Circuit upheld compensatory damages of about $80,000 (about $118,000 in current dollars) for a plaintiff who testified to feeling degraded by his termination, having financial problems that required him to depend on his friends and family, and being unable to support his children.  *Id.* at 1066–67; *see* CPI Inflation Calculator, https://data.bls.gov/cgi-bin/cpicalc.pl?cost1=80%2C000.00&year1=200005&year2= 201902 (last visited Aug. 21, 2019).

Under the law, however, the Court need not "completely analogize the damage award in this case to an identical case with either a similar or dissimilar verdict." *Gracia*, 842 F.3d at 1023.  Indeed, a comparison to one or two other cases cannot provide a statistically valid sample.  For that reason, awards in other cases "do not establish a range beyond which awards are necessarily excessive." *Farfaras*, 433 F.3d at 566. Thus although the verdict in *Tullis* and the reduced damages amount in *Deloughery* suggest that the compensatory damages award is excessive, they do not mechanically impose an upper limit on the amount of damages that Morris can recover.

According appropriate deference to the jury's role in determining the extent of the harm Morris suffered, the Court concludes that remittitur of the compensatory damages

---

bin/cpicalc.pl? cost1=200000&year1=199909&year2=201902 (last visited Aug. 21, 2019).

award is appropriate.  In calculating the amount of the remittitur, the Court finds a comparison with *Deloughery* instructive.  The harm about which Morris testified, including being fired and losing his apartment and his car, was significantly more severe than that experienced by the plaintiff in *Deloughery*, who kept her job and did not present evidence of financial hardship.  *See Deloughery*, 422 F.3d at 620.  Though the Court is mindful that juries "are responsible for evaluating the credibility of witnesses who testify to emotional distress," *Gracia*, 842 F.3d at 1022, the Court had the benefit of seeing Morris's demeanor on the stand and observing that these experiences had a significant impact on his mental state.  Giving due deference to the jury's constitutionally prescribed role as the finder of fact, the Court concludes that a damages award higher than the amount approved in *Deloughery* (about $234,000 in current dollars) but less than the $375,000 awarded by the jury is appropriate.  A compensatory damages award not exceeding $275,000 rationally reflects the evidence adduced at trial.

The Court will grant BNSF's motion for a new trial on the issue of damages unless Morris accepts, within fourteen days of this order, a reduction of the compensatory damages award to $275,000.  The Court notes that if Morris elects to pursue a new trial, "the jury must be allowed to consider both compensatory and punitive damages."  *Beard v. Wexford Health Sources, Inc.*, 900 F.3d 951, 955 (7th Cir. 2018) ("Because compensatory and punitive damages are correlated, they must be considered jointly.  But a second jury need not reconsider [the defendant's] liability.").

### 2.    Punitive damages

BNSF next contends that it is entitled to judgment as a matter of law or remittitur with respect to the jury's award of $500,000 in punitive damages.  Punitive damages are

appropriate if "the employer 'engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual.'" *Gracia*, 842 F.3d at 1025 (quoting 42 U.S.C. § 1981a(b)(1)). BNSF contends that Morris failed to introduce evidence that it discriminated "in the face of a perceived risk that its actions will violate federal law" as required to support the award. *Id.*

The Court concludes that the trial evidence adequately supports the jury's finding that BNSF acted with the state of mind to necessary to impose punitive damages under Title VII and section 1981. Hendrickson testified that he knew it was illegal to discriminate on the basis of race. As the Seventh Circuit has explained, a plaintiff may show malice or reckless indifference "by demonstrating that the relevant individuals knew or were familiar with the anti-discrimination law but nonetheless ignored them or lied about their discriminatory activities." *EEOC v. AutoZone, Inc.*, 707 F.3d 824, 835 (7th Cir. 2013) (internal quotation marks omitted). And unlike *Gile v. United Airlines, Inc.*, 213 F.3d 365 (7th Cir. 2000), on which BNSF relies, there is no evidence that BNSF discriminated despite a good-faith belief that it was acting in accordance with federal civil rights law. *See id.* at 375–76 (holding that punitive damages were unsupported by the evidence because the employer was merely negligent in believing that it had provided a sufficient accommodation for the plaintiff's disability).

BNSF points to its anti-discrimination policies as evidence of its good faith, but those policies do not preclude the punitive damages award. *See EEOC v. Mgmt. Hosp. of Racine, Inc.*, 666 F.3d 422, 438 (7th Cir. 2012) (noting that the existence of anti-discrimination policies "is not sufficient in and of itself to insulate an employer from a

punitive damages award. Otherwise, employers would have an incentive to adopt formal policies in order to escape liability for punitive damages, but they would have no incentive to enforce those policies."). The jury could have reasonably concluded that BNSF's policies—about which it introduced relatively little evidence—were ineffective at achieving their purpose given Hendrickson's discriminatory conduct. *See AutoZone*, 707 F.3d at 838 (holding that punitive damages were appropriate against AutoZone where "a rational jury could [] have concluded" that the relevant decisionmaker "disregarded AutoZone's anti-discrimination procedures").

BNSF also seeks remittitur, arguing that the punitive damages award is excessive. As with the assessment of compensatory damages, the Court's inquiry is guided by three factors: "the degree of reprehensibility of the defendant's conduct; the disparity between the harm suffered by the plaintiff and the punitive damages award; and the difference between the award in this case and the penalties imposed in comparable cases." *Gracia*, 842 F.3d at 1023.

BNSF contends that its conduct was not sufficiently reprehensible to support punitive damages of $500,000. But as the Seventh Circuit has noted, "[o]ne of the purposes of punitive damages is to limit the defendant's ability to profit from its wrongful conduct by escaping detection." *Id.* at 1025; *see also Lampley v. Onyx Acceptance Corp.*, 340 F.3d 478, 486 (7th Cir. 2003) (holding that a large punitive damages award is warranted if the defendants have "engaged in a cover-up in flagrant violation of Title VII"). In *Gracia*, the defendants created a false paper trail to disguise the fact that they fired the plaintiff in retaliation for her complaints of sexual harassment. In this case, Morris elicited the admission that Hendrickson falsely swore in a declaration that Morris

was ineligible for alternative handling because he refused to accept responsibility for his actions. Similarly, Hendrickson testified that one of BNSF's interrogatory answers— which stated that Hendrickson independently recommended Morris's dismissal—was false, supporting a reasonable inference that either he or the company sought to shift blame for Morris's firing onto someone else. Although Hendrickson and BNSF's conduct is arguably less egregious than that of the defendants in *Gracia*, a jury could reasonably conclude that Hendrickson lied under oath to cover up a discriminatory motive. The evidence of this conduct supports the jury's award of punitive damages.

The Court concludes, however, that a reduction of the punitive damages award is necessary in light of the reduction of compensatory damages. As the Seventh Circuit explained in *Beard*, "[b]ecause compensatory and punitive damages are correlated, they must be considered jointly." *Beard*, 900 F.3d at 955. To order a remittitur solely on the award of compensatory damages would risk offending due process because the constitutionality of punitive damages depends in part on the disparity between the harm suffered by the plaintiff and the amount of the award. *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 580–83 (1996). Because the Court has granted a remittitur of the compensatory damages award amounting to a little over twenty-five percent, it does the same with respect to the punitive damages amount, ordering a remittitur to $370,000.

This reduction is reasonable in light of the evidence and in comparison with other cases. The award of $370,000 is approximately 1.35 times greater than the reduced compensatory damages amount of $275,000. This ratio is reasonable; as the Seventh Circuit explained in *J.K.J. v. Polk County*, 928 F.3d 576 (7th Cir. 2019), a "ratio between the punitive and compensatory damages awards [of] less than two-to-one" is not

constitutionally improper.  *Id.* at 604; *see also Lampley*, 340 F.3d at 485–86 (upholding, in a Title VII race-discrimination case, punitive damages of $270,000, 3.6 times greater than the compensatory damages award).  The Court will therefore grant BNSF's motion for a new trial on the issue of damages unless Morris accepts, within fourteen days of this order, a reduction of the punitive damages award to $370,000.

**D.    Jury instructions**

BNSF contends that it is entitled to a new trial because the Court elected not to give the jury a cautionary instruction on the reasonableness of BNSF's decision to terminate Morris.  The proposed instruction stated, "In deciding Mr. Morris' claim, you should not concern yourselves with whether BNSF's actions were wise, reasonable, or fair.  Rather, your only concern is whether Mr. Morris has proved that BNSF's termination of him was because of his race."  Trial Tr., dkt. no. 264–3, at 304:18–22.  This instruction is modeled on Seventh Circuit pattern instruction 3.07.

In declining to include the proposed instruction, the Court expressed the view—which it maintains—that pattern instruction 3.07 (which the pattern instructions specifically identify as discretionary) is both unnecessary and partially inaccurate.  The instruction is unnecessary because the instruction given to the jury on Morris's claim for race discrimination already required him "prove by a preponderance of the evidence that he was terminated by BNSF *because of his race*."  Jury Instructions, dkt. no. 230, at 9 (emphasis added).  And the first half is at least partially inaccurate because it implies that the question of whether BNSF took a racially-motivated adverse employment action is entirely separate from the question of whether its conduct is unfair, unreasonable, or unwise.  Reasonable jurors could believe, however, that racial discrimination in

employment *is* a type of unfairness and that an employer who racially discriminates acts unreasonably or unwisely.  Instructing the jury not to consider whether BNSF acted unreasonably or unfairly thus risks needless confusion.[4]

Even if the proposed instruction is not incorrect or misleading, the Seventh Circuit has explained that "pattern instructions are helpful resources, not holy writ." *United States v. Edwards*, 869 F.3d 490, 500 (7th Cir. 2017).  That is particularly true with respect to pattern instruction 3.07, the committee comment to which, as indicated earlier, expressly states that the decision to give the instruction falls within the discretion of the trial court.  *See* Fed. Civ. Jury Instr. 7th Cir. 3.07 (2018) ("The Committee suggests that a court give this cautionary instruction at its discretion in Title VII . . . cases.").  Moreover, in the context of this case, there is no reason to believe that the omission of the instruction caused confusion to the jury or prejudice to BNSF.  As Morris points out, the trial evidence suggesting that BNSF treated Morris unfairly was coextensive with the evidence that it racially discriminated against him—namely, that non-African-American employees were given more lenient discipline for comparable violations.  Thus any error "likely made no difference in the outcome" and does not

---

[4] The Court acknowledges that a properly crafted instruction distinguishing between unfairness and discrimination may be appropriate.  Such an instruction might say, for example, "Evidence that the defendant's actions were not wise, reasonable, or fair is insufficient to establish the plaintiff's claims.  Rather, you must decide whether the plaintiff has established discrimination as defined the instruction describing that claim." But BNSF did not tender that instruction or any acceptable alternative, and, having failed to do so, it cannot rely on that hypothetical instruction to support its motion for a new trial.  *See Lewis v. City of Chi. Police Dep't*, 590 F.3d 427, 438 (7th Cir. 2009) ("Even if a party is entitled to an instruction, it is required to tender an instruction that correctly state[s] the law in order to challenge the district court's refusal to use it." (internal quotation marks omitted)).

constitute a basis for ordering a new trial.[5]  *Guzman v. City of Chicago*, 689 F.3d 740, 745 (7th Cir. 2012).

## E.  Evidentiary rulings

BNSF's remaining arguments in support of its motion for a new trial concern several of the Court's evidentiary rulings.

### 1.  Testimony of late-disclosed defense witnesses

The Court excluded the testimony of Andrea Smith, Hannah Stadheim, and Jason Jenkins because they were not timely listed as potential witnesses in BNSF's initial disclosures under Rule 26(a)(1).  BNSF amended its disclosures on January 19, 2019—about one month before trial—to include their names.  At the final pre-trial conference, the Court noted that neither Morris's nor BNSF's trial counsel was involved in the case during the initial disclosures and suggested, as an alternative to excluding the testimony, that the parties might agree to continue the trial date to take depositions of the additional witnesses.  Morris did not agree to that extension—as was his right— and the Court excluded the testimony of Smith, Stadheim, and Jenkins under Rule 37(c)(1), which requires exclusion unless BNSF's nondisclosure was "substantially justified or harmless."

---

[5] In a footnote in its reply brief, BNSF cites particular questions from the jury as evidence that the jury was unduly concerned with the fairness or the wisdom of BNSF's actions.  But these questions were merely general inquiries into Morris's work environment and BNSF's disciplinary policies; they do not constitute grounds to believe that the jury failed to follow the jury instructions—which accurately stated Morris's burden—in reaching the verdict.  That aside, one cannot plausibly read as much into these questions as BNSF suggests.  As has been the Court's experience in allowing juror questions in civil cases (and talking to juries after the fact) for the past fifteen years, the most likely explanation for these particular questions, as with most, was that particular jurors were simply trying to understand evidence involving matters unfamiliar to them or trying to fill in gaps left by lawyers during their questioning of witnesses.

BNSF first contends that this was error because Morris knew the identities of Smith and Jenkins and was aware that they possessed information that was potentially relevant to the case. But as the Court noted at the final pre-trial conference, the fact that a party knows that an individual has relevant information does not constitute notice that the other side intends to call that person to testify. For example, in *Karum Holdings LLC v. Lowe's Companies, Inc.*, 895 F.3d 944 (7th Cir. 2018), the Seventh Circuit held that the disclosure of an individual as a fact witness did not excuse the nondisclosure of that same individual as an expert. *Id.* at 951. The court relied on the holding in *Musser v. Gentiva Health Services*, 356 F.3d 751 (7th Cir. 2004), rejecting the argument that it is pointless to insist on the "[f]ormal disclosure of experts" who are already known to be fact witnesses because that disclosure directly affects the opposing party's ability to conduct discovery and prepare a trial strategy. *Id.* at 757.

Though the circumstances of this case differ, *Karum Holdings* and *Musser* illustrate that a party's knowledge that a person could, in principle, provide relevant trial testimony does not eliminate the harm associated with the opposing party's failure to disclose that person as a witness under Rule 26(a)(1). Indeed, the nondisclosure in this case was arguably more harmful because Morris was not given timely notice of BNSF's intent to Smith or Jenkins for *any* purpose, thus denying Morris the chance "to properly prepare for trial." *Musser*, 356 F.3d at 757.

BNSF also argues that the Court's decision was erroneous because Morris rejected an option that would have cured any prejudice—namely, to continue the trial date to take additional depositions of the late-disclosed witnesses. But BNSF cites no authority for the contention that Morris was required to accommodate its late disclosure

by further delaying his jury trial—then scheduled to begin just over one month later—in a case that had already been pending for nearly four years.  BNSF's procedural misstep was its own doing.  And as the Seventh Circuit explained in *Musser*, although the Court "could have rescheduled the date for trial and allowed more time for depositions," forcing Morris to accept a continuance entailed further delay and additional costs and would not have been harmless to Morris.  *Musser*, 356 F.3d at 759; *see also Keeton v. Morningstar, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012) (noting that district courts have broad discretion to decline to order a continuance after a party fails to comply with deadlines).

BNSF next cites this Court's summary judgment opinion, in which the Court stated that it would consider the plaintiff's late-disclosed comparator evidence.  But the circumstances of the non-disclosure here are considerably different.  The Court explained that Morris's comparator evidence emerged after Morris retained a new attorney and the Court reopened discovery for the limited purpose of conducting written discovery about fifteen possible comparators.  *See Morris*, 2018 WL 4742105, at *2.  In this context, the Court found that there was no surprise or prejudice to BNSF because under the circumstances it was obvious that Morris would use the identities of these additional comparators in opposing summary judgment.  Here, by contrast, BNSF's intent to call additional witnesses was unknown to Morris until the eve of trial.  The risk of unfair prejudice thus was considerably greater.[6]

---

[6] In two footnotes, BNSF also contends that excluding the testimony was erroneous because some of the witnesses' testimony would have been used to impeach Morris.  But BNSF forfeited this point by failing to raise it at any time before or during trial.  And its argument is not just too late but also too little:  it is limited to perfunctory footnotes that fail to identify the impeachment purpose of each witness's testimony.  Moreover,

Finally, BNSF argues that the Court improperly limited the testimony of one of BNSF's witnesses, Robert Della-Pietra. In its supplemental Rule 26(a)(1) disclosures from January 2019, BNSF stated that Della-Pietra would testify regarding "the discipline policies and practices and safety and conduct rules" at BNSF. BNSF's Supp. Rule 26(a)(1) Disclosures, Ex. C to Morris's Mots. in Limine, dkt. no. 216–3, at 2. At the final pretrial conference, the Court excluded this additional testimony because it was outside the scope of the initial Rule 26(a)(1) disclosures, which did not provide notice that Della-Pietra would testify about the discipline of other employees in comparison with Morris. The fact that the earlier disclosure stated that Della-Pietra would testify generally about his duties as a supervisor was not adequate to permit the admission of this specific evidence regarding the treatment of others. For the reasons the Court has previously explained, exclusion of this late-disclosed testimony was appropriate under Rule 37.

## 2.    Arbitration decision

BNSF's last argument in support of its motion for a new trial is that the Court improperly excluded the written arbitration decision upholding Morris's termination and erroneously barred BNSF from introducing evidence about that decision. The Court held that the decision itself was hearsay not within any exception and that evidence about that proceeding risked confusion and unfair prejudice that substantially outweighed its probative value under Federal Rule of Evidence 403.

The only pertinent case that BNSF cites on the issue of hearsay is *Stimeling v.*

---

Rule 26(a)(3) excuses the nondisclosure only of witnesses who testify "solely for impeachment purposes," not the other, broader purposes for which BNSF sought to introduce the testimony of Smith, Jenkins, and Stadheim. *See DeBiasio v. Ill. Cent. R.R.*, 52 F.3d 678, 686 (7th Cir. 1995).

*Board of Education Peoria Public Schools District 150*, No. 07-1330, 2010 WL 4922880 (C.D. Ill. Nov. 29, 2010), in which the court concluded that an arbitrator's decision was admissible under Federal Rule of Evidence 803(8)(C) (later renumbered to Rule 803(8)(A)(iii)), the hearsay exception for records or statements of a public office that set out "factual findings from a legally authorized investigation." *Id.* at *2. The Court respectfully disagrees with the district court's conclusion in *Stimeling*, as that exception applies only to investigations by a public office, not by private arbitration organizations. *See United States v. Blackburn*, 992 F.2d 666, 672 (7th Cir. 1993) (holding that the exception applies only if the authors of the report were "the equivalent of government investigators"); *see also Mathis v. Carter*, No. 13 C 8024, 2017 WL 56631, at *5 (N.D. Ill. Jan. 5, 2017) (explaining that because the authors of report did "not hold any public office," the report was "not a 'record or statement of a public office,' as Rule 803(8) requires").

BNSF also cites *Sievert v. City of Sparks*, No. 3:10-cv-00771-LRH-WGC, 2014 WL 358698 (D. Nev. Jan. 31, 2014). *Sievert* is inapposite; there, the court found that the arbitration decision was relevant for the non-hearsay purpose of showing the defendants' state of mind—specifically that they acted with a retaliatory motive after seeing the arbitration order. *Id.* at *2. BNSF can identify no comparable non-hearsay purpose for the arbitration order it sought to introduce in this case. Notably, on the morning of trial, BNSF argued that it should be able to introduce the arbitration order for impeachment purposes. When the Court inquired what the order would be used to impeach, BNSF's counsel was unable to provide an answer and thus forfeited the point. Even in its post-trial briefs, BNSF has not offered any additional explanation to

substantiate its argument concerning impeachment. BNSF has thus identified no error in the Court's conclusion that the arbitration order is inadmissible hearsay.

BNSF next contends that the Court improperly excluded all testimony concerning the arbitration proceedings even though that testimony would not constitute hearsay. But BNSF overlooks the fact that the Court separately excluded this evidence under Rule 403. That decision is supported by the Seventh Circuit's holding in *Jackson v. Bunge Corp.*, 40 F.3d 239 (7th Cir. 1994). In *Jackson*, the court noted that exclusion of a similar arbitral ruling was appropriate under Rule 403 because the arbitrator had not considered the key issue in the case: whether the defendant had acted with an unlawful retaliatory motive. *Id.* at 246. Similarly, in *Perry v. Larson*, 794 F.2d 279 (7th Cir. 1986), the court held that an arbitrator's ruling was properly excluded because the "issue of political motivation"—the basis of the plaintiff's federal civil rights claim—"was not sufficiently explored during the arbitration proceeding." *Id.* at 284. As in *Jackson* and *Perry*, the question of race discrimination was not presented to the arbitral panel that reviewed Morris's termination. Introducing evidence about that decision thus would have confused the jury and risked unfair prejudice that substantially outweighed the probative value of the evidence. The Court's evidentiary rulings on the issue of the arbitration order therefore do not constitute a basis on which to order a new trial.

## Conclusion

For the foregoing reasons, the Court denies the defendant's motion for judgment as a matter of law [dkt. no. 249] but grants its motion for a new trial to the extent that it seeks remittitur of the damages award [dkt. no. 251]. Unless the plaintiff advises the Court on or before September 5, 2019 that he accepts a reduction of the compensatory

damages award to $275,000 and a reduction of the punitive damages award to
$370,000, the Court will grant in part the defendant's motion for a new trial on the issues
of compensatory and punitive damages.

MATTHEW F. KENNELLY
United States District Judge

Date:  September 13, 2019