

CERTIFIED COPY

A True Copy
Teste:

_____
Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

In the

# United States Court of Appeals

## For the Seventh Circuit

_____

Nos. 19-2808 & 19-2913

RON MORRIS,

*Plaintiff-Appellee/Cross-Appellant,*

*v.*

BNSF RAILWAY COMPANY,

*Defendant-Appellant/Cross-Appellee.*

_____

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:15-cv-2923 — **Matthew F. Kennelly**, *Judge.*

_____

ARGUED JUNE 5, 2020 — DECIDED AUGUST 11, 2020

_____

Before EASTERBROOK, HAMILTON, and SCUDDER, *Circuit
Judges.*

SCUDDER, *Circuit Judge.* Ron Morris worked for nine years
as a train conductor for Burlington Northern Santa Fe Rail-
way. The company fired him after he committed two speed-
ing infractions during a single shift. Morris, who is African-
American, invoked Title VII and brought suit to challenge his
termination, alleging that BNSF punished him more severely
than non-black employees who committed similar safety

violations. His case proceeded to trial and a jury found in his favor. BNSF challenges the district court's decisions at every stage of the case, from the viability of Morris's theory of discrimination and sufficiency of his evidence to discovery rulings and remedies. We see no errors and affirm, on most issues applying a deferential standard of review and respecting the district court's close proximity to questions bearing upon management of the litigation and the admissibility and adequacy of evidence.

## I

### A. Morris's Employment and Termination from BNSF

Ron Morris started working at BNSF as a conductor in 2004. In 2011 he began operating trains traveling between Savanna and Aurora, Illinois. During a shift one day in March 2013, a data recorder showed that Morris's train—a so-called "key train" carrying hazardous chemicals—had twice exceeded speed limits by 10 and 12 miles per hour. Morris failed to follow company rules requiring self-reporting of the violations. An investigation ensued and was sure to result in Morris being disciplined.

Morris's discipline would come after one of two processes ran their course. It is easiest to think of them as either informal or formal. In the formal process, BNSF labor relations and management gather information about the employee's safety infractions and conduct a hearing. The hearing officer recommends what discipline, if any, to impose after considering the facts and a written policy categorizing violations by their level of seriousness. If the hearing officer and the employee's supervisor recommend termination, the company's Review Board assesses the evidence and makes the final decision.

BNSF allows employees like Morris to seek permission to travel one of two informal disciplinary paths. First, an employee who is offered "waiver" can admit the alleged misconduct, forgo a formal investigation, and agree to accept the recommended sanction—all with the hope of receiving a lesser degree of discipline than would have emerged at the end of a more formal and resource-intensive process.

The company's policies also include an informal pathway called "alternative handling." As its name implies, this avenue affords an alternative to BNSF's formal investigative processes and allows the matter to be handled at lower levels. By way of a rough analogy, think of alternative handling as a way for line supervisors to handle the matter themselves—perhaps with some strong words of warning and a promise of no such leniency in the future—without sending the offending employee to the plant manager or corporate office for a determination of the sanction. Any discipline, warnings, or corrective actions that result from alternative handling do not appear on the employee's permanent record. It is easy to see why an employee would prefer the informal process to the formal investigation: it is the same reason why a student caught violating a school rule will often prefer that his teacher handle the matter in the classroom instead of sending him to the principal's office.

Morris came to the same view and sought to have his two speeding infractions addressed through alternative handling or waiver. He thought he had a good chance of resolving the matter that way because other employees had done just that—and managed to keep their jobs—after committing similar safety violations. The parties tangle over whether Morris properly submitted his waiver request. What matters for these

purposes, though, is that ultimately Scott Hendrickson, the Superintendent of Operations for BNSF's Chicago division, rejected Morris's request for alternative handling and made no mention of waiver.

Hendrickson's reasons for denying alternative handling shifted over time and began with the explanation that Morris was ineligible because he violated "Critical Work Practices," a term Morris had never heard of or seen in any workplace policy manual. During litigation the company offered a new reason, suggesting that it disallowed Morris's access to the informal pathways because he was operating a key train with hazardous chemicals. Morris found the inconsistencies concerning and thought they might mask the real reason why Hendrickson insisted on pressing the matter to a formal investigation and discipline.

Eventually Morris found himself in a formal disciplinary hearing along with the engineer who worked the same shift during which the two speeding violations occurred. The hearing officer recommended terminating the engineer and suspending Morris for 30 days. Hendrickson forwarded the recommendation to the Review Board. Andrea Smith, BNSF's Director of Labor Relations and a member of the Review Board, responded by supporting the dismissal of both employees. In April 2013 Morris received a letter terminating his employment. He challenged the termination within the company and then through union arbitration. When those efforts proved unsuccessful, Morris decided to head to court.

### B.  The Lawsuit

In April 2015 Morris filed suit challenging his termination under Title VII of the Civil Rights Act of 1964 and Section 1981

of the Civil Rights Act of 1866. Title VII prohibits employers from "discriminat[ing] against any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Section 1981 guarantees equal rights to all citizens regardless of race and in the context of employment provides that all people have the "same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). We can consider Morris's claims under Title VII and Section 1981 together, though, because both statutes "have the same liability standards." *Walker v. Abbott Lab'ys.*, 340 F.3d 471, 474 (7th Cir. 2003). So, while we refer only to Title VII throughout the opinion for simplicity, our reasoning applies to Morris's claim under both enactments.

Morris alleged two theories of discrimination—racial harassment (based on comments made by Hendrickson and other BNSF managers) and disparate discipline (based on differences in how black and non-black employees were treated after committing similar rule violations). The racial harassment allegation eventually fell out of the case, whereas Morris succeeded in getting his disparate discipline claim to trial and the jury finding in his favor. A few more words about Title VII disparate discipline liability are therefore in order and provide essential context.

Disparate discipline is a theory of liability rooted, as its name conveys, in proving different treatment for discriminatory reasons—here, as Morris alleged, through the imposition of more severe discipline when compared with the discipline non-black employees received for committing similar violations of BNSF's safety standards. See *Luster v. Ill. Dep't of Corr.*, 652 F.3d 726, 730 (7th Cir. 2011) (explaining that Title

VII protects workers who violate workplace rules but receive harsher discipline because of their protected status).

At a more specific level, Morris's allegation focused on how his discipline came about. The allegation drew upon the difference between the formal versus informal discipline pathways. Morris believed that his termination was the product of Scott Hendrickson denying his request for alternative handling and waiver and instead sending his case down the company's more formal pathway with more serious sanctions. Morris came to ground his contention in facts he learned about other employees in discovery. BNSF had produced documents showing, at least as Morris saw it, that approximately two dozen non-black employees committed equally serious safety violations yet were able to resolve the matters through the informal process and, most importantly, without getting fired.

After three years of discovery, BNSF moved for summary judgment. The company succeeded in showing that Morris failed to timely file an EEOC charge on his allegation of racial harassment, so the district court dismissed that allegation in BNSF's favor. No aspect of this appeal relates to that theory of discrimination.

BNSF sought summary judgment on Morris's disparate discipline claim on two grounds. The company argued that Morris's evidence addressing the discipline imposed on other employees—whom employment law refers to as "comparators"—was too vague to allow a jury to find any disparate treatment, let alone that the reason for the differential discipline was race. As the company saw the evidence, the employees Morris featured in opposing summary judgment were not like him at all, as they committed less severe safety violations.

BNSF emphasized that Morris committed two speeding violations during a single shift while operating a key train carrying hazardous materials.

The district court decided that the disparate discipline claim should go to a jury. In denying BNSF's motion, the court determined that the comparator evidence allowed a reasonable jury to find that the company's explanation for Morris's termination was a cover-up for race discrimination.

### C.  The Trial Evidence

Over the course of a four-day trial, the jury heard from Morris, Scott Hendrickson, a white conductor named Thomas Lynch, and Chicago Foreman Robert Della-Pietra. Time and again, BNSF emphasized its commitment to safety and Morris's speeding infractions while operating a key train. The gravity of these two violations during a single shift, the company urged, differentiated Morris's misconduct from those of the so-called comparator employees and warranted the more severe disciplinary measure of termination.

Morris pressed a different view of the evidence. He highlighted BNSF's ever-changing explanations for denying his request for alternative handling, suggesting that the shifting reasons reflected efforts to disguise racial discrimination. More specifically, Morris noted that, while BNSF's letter rejecting his alternative handling request cited "Critical Work Practices," neither Hendrickson nor Della-Pietra could identify any company policy or training document explaining the phrase.

Morris also exposed as suspect BNSF's purported reason for why he did not receive a waiver. The company insisted that he failed to go through the proper channels to request a

waiver of the more formal investigation and disciplinary process. But Thomas Lynch, one of Morris's white coworkers, testified that he managed to keep his job and avoid termination after derailing a train carrying hazardous materials. He also said that he was offered waiver without requesting it. These are two examples of at least four discrepancies that Morris highlighted at trial.

When it came to comparator evidence, Morris featured other employees from within the same geographic region who worked under Scott Hendrickson's (ultimate) supervision. All of this evidence came from information BNSF produced in discovery. And at trial Morris elicited much of his comparator evidence through Hendrickson, who testified as a defense witness. He questioned Hendrickson about the safety infractions committed by particular employees, the race of those workers, and what, if any, sanction they received by traveling the informal discipline path. By the conclusion of Hendrickson's testimony, Morris's counsel had asked about 24 other employees that seemed to have committed similar infractions yet were channeled into the informal discipline process and—unlike Morris—received lesser discipline.

A quick snapshot of some of Morris's comparator evidence illustrates the point in more concrete terms:

- *Kellan Smith* disabled safety equipment so that his train could run above the speed limit and committed other safety infractions. He received waiver and kept his job. Upon committing another infraction while on probation for his first offense, he received a second waiver and again kept his job. When asked about Smith's discipline, Hendrickson said

he did not remember the incidents and could not explain why Smith received two waivers.

- *Michael Wyatt* received alternative handling after going 14 miles per hour above the speed limit. About a year later he violated three safety rules but received a waiver and kept his job. When asked why Wyatt was not fired, Hendrickson resorted to saying that every incident is unique and handled in its own way.

- *Justin Ross* received waiver and kept his job after he admitted to speeding and two other violations. Hendrickson said that Ross's violations could have supported dismissal but speculated that Ross received waiver and a 30-day suspension because the discipline "depended on the circumstances and the situations."

These employees—and the 21 others that Morris featured at trial through Hendrickson's testimony—were BNSF engineers or conductors, employees jointly responsible for the train's safety and bound by the same rules and disciplinary processes.

Apart from the failure to explain the different treatment between Morris and the non-black comparator employees, Hendrickson admitted making contradictory statements before and during the litigation. In response to Morris's questioning about the affidavit he signed, which the jury saw at trial, Hendrickson acknowledged that it contained inaccurate

information about Morris's discipline process. Hendrickson also conceded that the company's interrogatory response representing that he recommended Morris's dismissal was false, as other documents made clear that the decision came from the Review Board. Hendrickson could not explain the discrepancies.

At the close of evidence, BNSF invoked Federal Rule of Civil Procedure 50(a) and challenged the legal sufficiency of Morris's evidence. In the company's view, Morris failed to prove causation, as nothing about the comparator evidence connected Hendrickson's denial of alternative handling and waiver with the altogether independent decision the Review Board made to terminate Morris. BNSF also renewed its argument that Morris was not similarly situated to his comparators. The district judge denied the company's motion and submitted the case to the jury.

### D. The Jury Verdict

The jury returned a verdict for Morris, awarding $375,000 in compensatory damages and $500,000 in punitive damages. The district court then conducted a bench trial on the potential remedies of back pay, front pay, and reinstatement. It awarded $531,292 in back pay after rejecting BNSF's argument that Morris failed to mitigate his damages. The court then awarded $137,450 in front pay to compensate Morris for lost future income, in lieu of granting his request for reinstatement. The district court reasoned that the gravity of the safety infractions Morris committed would harm his ability to return to work without significant distrust and friction with his supervisors.

With the exception of granting the company's request to reduce compensatory and punitive damages—the former to $275,000 and the latter to $370,000—the district court denied BNSF's other post-trial motions. We take the issues in turn as they pertain to the company's expansive appeal and Morris's challenge to the denial of reinstatement.

## II

We start with BNSF's challenge to the district court's denial of its renewed motion for judgment as a matter of law. The company argues that the trial evidence was legally insufficient to support the jury's finding of Title VII and Section 1981 liability. In assessing BNSF's arguments on appeal, we take our own fresh look at the trial evidence—though we do so "strictly in favor" of Morris as "the party that prevailed at trial." *Schandelmeier-Bartels v. Chicago Park Dist.*, 634 F.3d 372, 376 (7th Cir. 2011). It is not our place to reweigh evidence, make alternative findings of fact, or second-guess credibility determinations. See *id*. As a court of review, we limit ourselves to asking whether the evidence sufficed as a legal matter to support the jury's verdict.

### A. Comparator Evidence

BNSF contends that Morris fell short of compiling an adequate slate of non-African American comparators. Beyond labeling Morris's comparator evidence "cryptic" and a "mishmash," the company views the other employees as lacking adequate similarity because not everyone operated a key train carrying hazardous materials nor committed a safety violation nearly as serious as Morris's two speeding infractions during a single shift. By lacking similarity along these two dimensions, the company continues, Morris's evidence was

incapable of supporting the jury's finding Title VII (or Section 1981) liability on a theory of disparate discipline.

We see no legal shortcomings in Morris's comparator evidence. He compiled his list of comparators by filtering and analyzing the information BNSF produced in discovery. Though BNSF now seems to criticize the quality of its own records, Morris presented the results of his synthesis with adequate clarity to allow the jury to see the other employees' race or ethnicity, work histories, safety infractions, and discipline, including whether the other employees benefited from informal alternative handling. The law required no more, and we have seen much less in other cases. See, *e.g.*, *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 723 (7th Cir. 2018) (reasoning that the plaintiff's comparator evidence in an age-discrimination suit was inadequate when it consisted "solely of a table listing the names and ages of the thirty-seven younger employees and the positions for which they were hired" with "no amplifying detail of the employees' qualifications or employment history"); *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 369 (7th Cir. 2019) (noting that the plaintiff failed to provide the proposed comparator employees' "names, work history, performance review, or—most importantly [given the type of claim]—their ages").

Nor was the jury required to view the comparator evidence as compelling the conclusion that Morris lost his job because he committed such serious safety violations. BNSF's safety rules did not distinguish between infractions involving key trains and other locomotives. While key trains were subject to different speed limits and other requirements under the *safety* policies, the *discipline* rules drew no distinction between trains carrying different cargo. This lack of differentiation

allowed Morris to fairly compare himself with non-African American train operators who committed speeding or other similar violations on trains with or without hazardous materials onboard. Morris stood on sound ground approaching his burden of proof this way. See *Coleman v. Donahoe*, 667 F.3d 835, 851 (7th Cir. 2012) (concluding that the plaintiff's proposed comparators—who received more favorable treatment despite "br[eaking] the same rule that [the plaintiff] allegedly did"—were similar enough to permit a reasonable inference of discrimination).

BNSF's contrary views fall short. Yes, it is possible some other plaintiff may have approached the evidence another way, including by analyzing the employment data in empirical terms (through, for example, a regression analysis) to discern the role, if any, that race played in discipline decisions. See, *e.g.*, *Vega v. Chicago Park District*, 954 F.3d 996, 1005 (7th Cir. 2020) (recapping the plaintiff's presentation of statistical data comparing the percentage of Hispanic and non-Hispanic managers fired during a certain period). It is equally fair to observe that Morris may not have neatly packaged and presented his comparator evidence, as he elicited it (indirectly) through his cross-examination of Scott Hendrickson.

Remember that litigation is not one-sided, though. BNSF had every opportunity to run a regression or apply other statistical tools to the employment information produced in discovery. Or perhaps the company could have presented an alternative slate of comparators (one, for example, extending beyond employees working under Hendrickson's supervision or within a certain geographic region) as a way of challenging the evidence Morris marshaled to support his allegation of disparate discipline. But those choices belonged to the

company, and our role is to take the case as the parties liti-gated it, see *United States v. Sineneng-Smith*, 140 S. Ct. 1575 (2020), recognizing that here BNSF let Morris set the table. Now is not the time to ask a series of what ifs.

Given the way that the case was litigated in the district court, we find no legal infirmity in Morris's approach. View-ing the trial evidence in the light most favorable to Morris, as we must on appeal, we have no doubt he satisfied the only obligation that matters. He introduced comprehensible and detailed evidence about how other employees were treated after committing safety violations.

## B. Causation

We likewise reject BNSF's interrelated contention that the trial evidence precluded a finding that the company termi-nated Morris because of his race. On this score, the company highlights what it sees as a disconnect between Morris's ac-count of discrimination and the company's decision to fire him. On Morris's account, the company urges, Scott Hen-drickson was the one responsible for any race-based discrim-ination, but he did not make the termination decision. That decision, BNSF says, came at the Review Board level when Andrea Smith chose to fire Morris for reasons having every-thing to do with safety violations and nothing to do with his race. To BNSF's mind, then, Morris failed to prove he lost his job because of his race. See 42 U.S.C. § 2000e-2 (prohibiting discrimination "because of" race or another protected status); see also *Vega*, 954 F.3d at 1006 (discussing requirement that there be a "causal link" between the discrimination and the termination or other adverse employment decision).

BNSF presses the same argument by recasting it in terms of our case law. It characterizes Morris's Title VII claim as one invoking the so-called "cat's paw" theory of liability and points out how Morris's claims depart from the ordinary application of that theory. The cat's paw theory owes its name to one of Aesop's fables in which a monkey "induces a cat by flattery to extract roasting chestnuts from the fire. After the cat has done so, burning its paws in the process, the monkey makes off with the chestnuts and leaves the cat with nothing." *Staub v. Proctor Hosp.*, 562 U.S. 411, 415 n.1 (2011). The classic cat's paw case occurs when an "*unwitting* manager or supervisor . . . is persuaded to act based on another's illegal bias." *Schandelmeier-Bartels*, 634 F.3d at 379 (emphasis added).

BNSF emphasizes that Morris's case diverges from this paradigm because Morris presented no evidence of trickery of any kind—indeed, no proof that Hendrickson even had a role in the termination decision. By the company's measure, the district court committed legal error in upholding the jury's verdict and imposing Title VII liability without evidence connecting any discrimination with the adverse employment consequence.

Whether we approach BNSF's argument through the lens of the trial evidence or by way of comparison with our cat's paw precedents, we reject it. Congress made the controlling inquiry under Title VII whether Morris lost his job because of his race. "[T]he sole question that matters is whether a reasonable juror could conclude that the plaintiff would have kept her job if she he had a different [protected status], and everything else had remained the same." *Vega*, 954 F.3d at 1004 (citing *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764 (7th Cir. 2016)) (internal quotations omitted). Morris sought to show

just that by drawing upon the comparator evidence to prove that, but for his race, Hendrickson would have determined the appropriate discipline for Morris through an informal process. But instead Hendrickson channeled him into a formal investigation, which was sure to lead to a serious sanction. We see no reason why Morris was not able to approach proving a Title VII violation this way.

Nor can we say the evidence was insufficient as a legal matter. The jury could have viewed Morris's comparator evidence as establishing that Hendrickson exercised his disciplinary gatekeeping authority by channeling non-African American employees toward informal processes sure to save their jobs, but refusing to let Morris proceed down that pathway. And given the gravity of Morris's infractions, directing him down the formal route was certain to result in termination or another harsh sanction—or at least a jury could have so found. The district judge saw the evidence this exact way, denying BNSF's post-trial Rule 50(b) motion because Morris established that Hendrickson made the waiver and alternative handling decisions for conductors in the Chicago area, and in so doing he "serves as a common denominator between Morris's termination and the disciplined issued to similarly situated non-African-American employees."

It makes no difference that the evidence Morris presented did not align perfectly with a classic cat's paw case. See *Lust v. Sealy, Inc.*, 383 F.3d 580, 584 (7th Cir. 2004) ("The [cat's paw] formula was (obviously) not intended to be taken literally."). Title VII does not require such pigeonholing. And as we have said before, metaphors intended to be illustrative can sometimes overcomplicate matters and distract from the real question at hand—a point we underscored in *Ortiz*. See 834 F.3d at

765. BNSF is right that Hendrickson did nothing to deceive the Review Board about Morris's speeding infractions. But that difference is of no legal significance where the same evidence allowed the jury to infer, based on the different treatment of non-black employees, that Hendrickson's decision to channel Morris down the path of formal discipline was based on race.

A related point warrants punctuating. It is of no moment that Hendrickson himself did not sign Morris's termination letter. Title VII encompasses employment decisions made by more than one person, for "[a]n employer's authority to reward, punish, or dismiss is often allocated among multiple agents." *Staub*, 562 U.S. at 420. And Morris's theory of discrimination is far from new. We have recognized before that the refusal to provide an employee access to progressive discipline (here, an informal channel of discipline) available to other workers can be a form of discrimination. See, *e.g.*, *Peirick v. Ind. Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 689 (7th Cir. 2007). Combining these principles, we cannot conclude that Morris's approach to Title VII liability was unavailable as a legal matter. The district court committed no error in denying BNSF's post-trial motion for judgment as a matter of law.

## III

That brings us to BNSF's challenge to the district court's denial of the company's motion for a new trial under Federal Rule of Civil Procedure 59. We review the denial of a motion for a new trial for abuse of discretion, and we uphold a jury verdict on appeal if the record provides a reasonable basis to do so. See *Pickett v. Sheridan Health Care Ctr.*, 610 F.3d 434, 440 (7th Cir. 2010). "A new trial is appropriate where the verdict

is against the clear weight of the evidence or the trial was not fair to the moving party." *Johnson v. Gen. Bd. of Pension & Health Benefits of the United Methodist Church*, 733 F.3d 722, 730 (7th Cir. 2013).

The company's argument is twofold, and the first ground—that the jury's verdict was against the clear weight of the trial evidence—need not detain us. We have explained why the evidence was legally sufficient to support the jury's verdict. We see no abuse of discretion in the district court's separate assessment, after reweighing the evidence, that a new trial was not warranted. See *Clarett v. Roberts*, 657 F.3d 664, 674 (7th Cir. 2011) (explaining the different standards of review for a Rule 50 motion for judgment as a matter of law and Rule 59 motion for a new trial).

BNSF also seeks a new trial based on the district court's decision not to follow our Pattern Jury Instructions and give the jury the so-called business-judgment rule instruction. That instruction would have resulted in the jury hearing the following: "In deciding Plaintiff's claim, you should not concern yourselves with whether Defendant's actions were wise, reasonable, or fair. Rather, your concern is only whether Plaintiff has proved that Defendant terminated him because of race." PATTERN CIVIL JURY INSTRUCTIONS OF THE SEVENTH CIRCUIT, 3.07 (rev. 2017).

We see no abuse of discretion in the district court declining to give the instruction. See *Rapold v. Baxter Int'l Inc.*, 718 F.3d 602, 609 (7th Cir. 2013). As the district judge underscored, the jury effectively learned of the governing law without it. The court made plain that Morris had to prove he was terminated because of his race—not for some other reason. While other judges may have opted to double down and give the

instruction, the district court's not doing so here does not warrant a new trial. The instructions the court provided "accurately stated the law and did not confuse the jury." *Schobert v. Ill. Dep't of Transp.*, 304 F.3d 725, 729 (7th Cir. 2002). That is all the law requires.

## IV

We come to BNSF's separate request for a new trial based on the district court's pretrial decision to bar three defense witnesses from testifying and to limit the testimony of a fourth witness. Here is what happened and why here, too, we will not upset the district court's reasonable exercise of discretion.

### A. Initial and Pretrial Disclosures

Four months after BNSF answered Morris's amended complaint and near the beginning of discovery, the company made its initial disclosures under Federal Rule of Civil Procedure 26(a)(1). By its terms, the Rule required BNSF to supply Morris with the names and contact information of people "likely to have discoverable information" related to his claims. FED. R. CIV. P. 26(a)(1). The Rule makes plain that these initial disclosures are just that—"initial"—and envisions they may (and often do) prove incomplete, for parties regularly come across additional people with discoverable information as well as documents containing information that may be used to support their claims or defenses. Rule 26 addresses this reality by imposing a duty to correct or supplement in a timely manner "if the party learns that in some material respect the disclosure or response is incomplete or incorrect." See FED. R. CIV. P. 26(e)(1)(A).

Adherence to the duty to supplement takes on practical importance in a case like this, where many BNSF employees play a role in the facts, substantial document productions occur, and the parties have sharply competing views about what information is pertinent to claims and defenses. In this way, supplemental disclosures help to separate wheat from chaff and bring focus to facts. And it matters to someone in Morris's shoes that BNSF attends diligently to making timely supplemental disclosures: the whole point of introducing the discovery mechanisms listed in Rule 26 was to ensure that trials would no longer be "carried on in the dark." *Hickman v. Taylor*, 329 U.S. 495, 501 (1947).

Here BNSF waited to supplement its disclosures until January 2019, following the close of a protracted discovery period and less than a month before trial. It was then that the company, for the first time, disclosed to Morris three employees with pertinent information—Andrea Smith, Hannah Stadheim, and Jason Jenkins. BNSF also updated its disclosure related to Robert Della-Pietra. In its initial disclosure, the company identified Della-Pietra as a source of information about Morris's work history. In its supplemental disclosure, BNSF informed Morris that Della-Pietra also had information regarding other incidents of employee discipline.

Morris argued that the new information had come way too late. He moved to exclude Stadheim, Smith, and Jenkins from testifying and to limit Della-Pietra to the topics outlined in BNSF's initial disclosure. See FED. R. CIV. P. 37(c)(1) (providing that if a party fails to disclose required information, "the party is not allowed to use that information or witness . . . unless the failure was substantially justified or is harmless"). BNSF countered that Morris knew about Smith, Stadheim,

and Jenkins from both his work at the company and documents the company produced earlier in discovery.

The district court granted Morris's motion and excluded the witnesses from testifying at trial. The court rejected BNSF's contention that the newly-disclosed witnesses were actually not new (because they had been identified in emails and other documents), explaining that "[i]t's one thing to know that a person's name is out there [but] it's another thing to know that the other side is intending to call him as a witness. That's why we have Rule 26(a) disclosures." From there the district judge afforded the parties the option of continuing the trial to allow Morris time to depose Smith, Stadheim, and Jenkins and to seek more information from Della-Pietra. When Morris's counsel declined the invitation, the court stood by its initial position and excluded the witnesses.

### B. Analysis

BNSF argues that the district court erred in its interpretation of Rules 26 and 37 and alternatively that, even if it identified the right legal standard, it committed error in excluding the witnesses. We review the allegation of legal error *de novo*, and again review the district court's discretionary ruling for abuse of discretion. See *Uncommon, LLC v. Spigen, Inc.*, 926 F.3d 409, 417 (7th Cir. 2019).

On the legal front, BNSF contends that the district court erred in not assessing whether its supplemental disclosures fit within the exception delineated in Rule 26(e)(1)(A) for information that has "otherwise been made known to the other parties during the discovery process or in writing." To the company's mind, the district court never answered that precise question and instead effectively focused on a different

inquiry (perhaps under Rule 26(a)(3)(A)) about whether Morris received timely notice of the witnesses BNSF intended to call at trial. Even more, BNSF says that it disclosed the relevance of Stadheim, Jenkins and Smith through interrogatory responses and prior document productions, and disputes that the duty to supplement imposed by Rule 26(e) required the company to say that it intended to call those employees as trial witnesses.

We see no legal error. While it is true that the district court did not expressly reason in terms of Rule 26(e), the court's analysis aligned closely with the precise consideration underlying the Rule's exception for otherwise known information. The court reasoned in practical terms and found, plain and simple, that BNSF waited too long to supplement its discovery—a finding that resulted in the district court then precluding the witnesses in question from testifying at all. The combined application of Rule 26(a)(3), Rule 26(e), and Rule 37 allowed the district court to reason along these lines. Put another way, we do not read the district court as somehow impermissibly invoking Rule 26(e) as a standalone matter to impose a witness-list disclosure mandate in tension with either Rule 26(a)(3) or the court's own standing order.

We also cannot accept the contention that the district court's exclusion reflected an abuse of discretion. BNSF's supplemental disclosures came too late—on the eve of trial and after three years of discovery. The company had no good reason for the late disclosures, telling the district court only that a new set of defense lawyers took over and acted to correct the omission without delay. As it did in the district court, BNSF also leans heavily on a no-harm-no-foul contention,

insisting that prior document productions effectively contained the same information as the supplemental disclosure.

We reject the contention for two interrelated reasons. *First*, we are unwilling to second-guess the district judge's assessment of the significance of the late disclosures. The parties vigorously disputed the matter, and the district judge had a ringside view and ultimately determined that BNSF's failure to timely supplement initial disclosures should not be excused, especially so close to trial. The district judge was uniquely positioned to see the circumstances this way. It is not in keeping with the deference mandated by the abuse of discretion standard for us to put a heavy hand on the other side of the balancing scale. *Second*, the district court's ruling gives plain and concrete effect to the unmistakable duty to timely supplement mandated by Rule 26(e). Complying should be a priority—not something brushed off as tedious or unimportant so long as the information disclosed late can somehow be unearthed like a needle in a haystack within a prior discovery production. Parties who do not attend diligently to their obligation to supplement initial disclosures proceed at their own peril. Banking on principles of harmless error to excuse negligence is risky business.

## V

Finally, we arrive at the parties' arguments about remedies. BNSF contends that the district court erred in awarding back pay and punitive damages. And for his part, Morris cross-appeals the district court's decision to award front pay rather than to reinstate his employment with BNSF. Yet again our review is deferential, respecting the district court's proximity to the evidence and assessment of the propriety of certain remedies. See *Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010,

1022 (7th Cir. 2016) (applying the abuse of discretion standard to a challenge to a punitive damages award when no constitutional issue is raised); *Bruso v. United Airlines, Inc.*, 239 F.3d 848, 861 (7th Cir. 2001) (applying the same standard to a challenge to a reinstatement decision).

### A. Back pay

After the jury returned a verdict in his favor, Morris enjoyed a presumption of entitlement to back pay. See *E.E.O.C. v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1579 (7th Cir. 1997). During the bench trial on remedies, he testified about his unsuccessful efforts to mitigate his damages by seeking a new job instead of waiting on a payout from BNSF. See *Brown v. Smith*, 827 F.3d 609, 616 (7th Cir. 2016) (explaining the plaintiff's duty to mitigate by seeking employment). Morris explained that whenever he interviewed for a position, his dismissal from BNSF always came up and, in his view, resulted in his not receiving a call-back interview or job offer.

BNSF questioned Morris's diligence to find new work by highlighting that he waited over a year to seek any work with another railroad company. The company's position was fair game as a legal matter, as an employee's failure to mitigate damages can serve as a defense to an award of back pay. See *id*. To succeed though, BNSF had to convince the district court that Morris not only failed to seek comparable employment in a diligent manner, but also that he had a reasonable likelihood of securing such work. See *id*.

We see no error in the district court's finding Morris diligently pursued a new job after losing his position at BNSF. Though Morris did not specifically seek railroad jobs for a period of time, he applied consistently for other positions within

the broader transportation sector. BNSF points to no legal au-
thority requiring Morris to seek only positions as a railroad
conductor for the new work to be comparable. The district
court did not abuse its discretion in awarding back pay based
on these facts.

## B. Punitive Damages

BNSF also challenges the district court's decision to up-
hold the jury's punitive damages award. Punitive damages
are available under Title VII when the plaintiff shows the de-
fendant "engaged in a discriminatory practice or discrimina-
tory practices with malice or with reckless indifference." 42
U.S.C. § 1981a(b)(1). The Supreme Court has interpreted the
statute to require a finding that the employer acted with "the
requisite mental state" or "in the face of a perceived risk that
its actions will violate the federal law." *Kolstad v. Am. Dental
Ass'n*, 527 U.S. 526, 535–36 (1999). "[E]gregious or outra-
geous" discrimination is not required. *Id.* at 535.

The district court found that Scott Hendrickson's testi-
mony justified the imposition of punitive damages. We see no
error, and definitely no abuse of discretion, in that conclusion.
Hendrickson admitted not only that he made false statements
in affidavits filed with the district court, but also offered in-
consistent reasons for not allowing Morris to resolve the
speeding violations through the informal means of waiver or
alternative handling. Whether those inaccuracies should have
been attributed to BNSF or its lawyers was up to the jury to
decide, but they certainly could have supported the inference
that the company was trying to hide discriminatory motives.
BNSF tries to characterize the shortcomings in Hendrickson's
testimony as benign, but its view of the evidence is neither
here nor there in light of the verdict in Morris's favor. See

*E.E.O.C. v. AutoZone, Inc.*, 707 F.3d 824, 834–35 (7th Cir. 2013); see also *Gracia*, 842 F.3d at 1024 ("We must assess the reprehensibility of [the employer's] conduct by viewing the facts as the jury found them.").

The company also labors to invoke the defense to punitive damages that applies "if the employer can show that it engaged in good faith efforts to implement an anti-discrimination policy." *E.E.O.C. v. Mgmt. Hosp. of Racine, Inc.*, 666 F.3d 422, 438 (7th Cir. 2012) (citing *Kolstad*, 527 U.S. at 545). This argument fares no better. Time and time again during the trial, the jury heard that BNSF's records for employees receiving alternative handling or waiver were woefully incomplete and lacking important detail. Bringing up these recordkeeping shortfalls was part of BNSF's strategy in arguing that Morris's comparator evidence was insufficient. The move seems to have backfired, as jurors asked multiple questions about the lack of detail in the records on the comparator employees. The jury could have reasonably concluded that regardless of the anti-discrimination policy written down on paper, there was no way for BNSF to make a "good-faith effort" to comply if it did not keep track of how it treated its workers. See *Kolstad*, 527 U.S. at 545–46.

## C. Reinstatement

Turning at last to Morris's cross-appeal, he challenges the district court's decision not to order his reinstatement at BNSF. Reinstatement is the "preferred remedy" for plaintiffs who have proven their termination was discriminatory and it should be awarded when feasible. *Hicks v. Forest Pres. Dist. of Cook County*, 677 F.3d 781, 792 (7th Cir. 2012). But we have recognized that in certain circumstances, reinstatement will be unworkable and all but impossible because of damaged

relationships and lost confidence. See *Bruso*, 239 F.3d at 861–62. Where, as here, the district court finds reinstatement impracticable, the plaintiff ordinarily receives a front pay award for income that he would have received were it not for the discriminatory firing. See *id*. at 862; see also *Avitia v. Metro. Club of Chicago, Inc.*, 49 F.3d 1219, 1231 (7th Cir. 1995) (explaining that front pay is intended "to put [the plaintiff] in the identical financial position that he would have occupied had he been reinstated").

The district court did not abuse its discretion in declining to order reinstatement. Morris admitted to committing the two speeding violations during the single shift and while operating a train carrying hazardous materials. The court saw the violations as serious and establishing that Morris would not enjoy "the confidence and respect" of the management if he returned to BNSF as a conductor, rendering his rehiring "infeasible." *Bruso*, 239 F.3d at 862. The perspective is plenty reasonable.

\* \* \*

Morris's case has traveled a long road. After three years of discovery, he defeated BNSF's motion for summary judgment, got his case to trial, and persuaded the jury that the company's decision to fire him reflected race-based discrimination, evidenced by the lesser discipline imposed on comparator employees who also had committed serious violations of safety rules. So many dimensions of BNSF's appeal require us to view the trial evidence in the light most favorable to Morris and otherwise to afford healthy doses of discretion to the district court's management of the litigation and decisions on appropriate remedies. Faithful to the demands of Title VII

28                                    Nos. 19-2808 & 19-2913

and the controlling standards of review, we AFFIRM across
the board.